BREAUX, O. J.
Plaintiffs are the father and mother of the late W. W. Willis, a young man about 23 years of age, who lost his life in the railway yards in the city of Shreveport on the 25th day of September, 1903, after dark on that day. The amount claimed by plaintiffs is $15,000.
A bill of exception is before us, taken by defendants, which will be disposed of preliminarily. The court charged that yards about a passenger depot are a public place, and those who go thereon to get on a train about to leave, and by mistake get on a train that has just come in, and is being pulled out to a coach shed, are not trespassers, even although they follow cars beyond the usual place for getting on and off, by two or three hundred feet.
The contention of defendant is that the charge is objectionable because it states a certain position at or near the depot that the person is supposed to have reached, which was a fact which should have been left to the jury.
From any point of view, the young man was either on the depot grounds or on defendants’ yard. The court’s statement that he was not a trespasser, standing on the one or the other, was not reversible error. In our view, a passenger who leaves the depot grounds to get to the train on which he wishes to take passage is not a trespasser, under the circumstances here, and considering the short distance the young man ran over a beaten path.
This, we think, disposes of the second bill of exception taken on grounds very similar, and the same is true as relates to the third bill of exception.
*41 They (plaintiffs) charge in their petition that the killing of their son was due to the negligent management of one of defendants’ employés.
The place of the accident was within the limits of the city, near the Union Depot, in the yards of the railroads.
Willis came to Shreveport in company with two other young men on an excursion train from Hughes Spring, Tex. As it was about time to leave, these young men walked to the depot.
They saw a train about to leave or leaving. They ran to get aboard. Two of the three ran ahead, and after they were on the train the porter said to them that they had made a mistake; they were not on the train. There are' six tracks in all. They then left this train and went to the excursion train; i. e., they got off and started back to catch their train. Willis was left behind in the race and lost sight of by his two companions.
A few moments after they had left the train, as just mentioned, and on then- boarding the excursion train, they heard of Willis’ death.
In running, as just mentioned, the young men, companions of Willis, ran to a point west or farther out from the Union Depot than the point where Willis’ body was found and where he was killed.
There were three men on the track; i. e., the three young men in question.
We have traced the steps of these young men from the city to the 'depot, and from the depot first to a train spoken of as the wrong train, and then to the right train, and while they were seeking to find their outgoing cars one of the number was killed.
Having followed these, young men as just stated, we take up for consideration the movement of the engine and tender with which the deceased collided on the night fatal to him. The engine and tender, are usually taken in charge by the hostler. This employé takes the engine to the train and to the depot, or, on the other hand, from the train and from the depot to the roundhouse.
At about 7:30 at night the hostler came to the engine, near the butting post. It was turned toward the depot. The head of the engine was thus turned. It was on track three. It had no cars connected to it. This hostler had a helper. The work to be done with that engine consisted in backing down No. 3 track to the main line of the Vicksburg, Shreveport & Pacific Road, and then take the main line, and head down the main line to the roundhouse.
As usual, he backed the engine out on his way to the roundhouse. This hostler or engineer testified that, a moment after he had thus commenced to back the engine, he noticed the deceased, coming down the track, passed him (that is, passed the engine), and then climbed up to the side of the track, “got up on the steps, and swung around the corner. I thought he 'got on the back end, going to the side of the back end. I did not see him any more until we passed over him” — to quote from the testimony of the engineer.
The accident occurred, this engineer says, just before getting on the main line. The engine and tender were stopped to enable the switchman to throw off the switch to “head down on the main line.” The body of the young man was found near the connection between the main line and No. 3 track.
The engineer does not know when his engine’ passed over the body. There was no jar felt by him. The wheels of the tender passed over the body first, and in all probability there was very little, if any, jar while the wheels of the engine were passing over him.
The body was found about 20 feet in front of the pilot. The engine was reversed, which accounts for the body being in front of the pilot.
The deceased was familiar with railroad *42 ing. He occupied a subordinate position on one of the railroads — brakeman or fireman.
It is also in place here to state that the engine was running at the rate of about two miles an hour at the time of the accident.
There was at this place a passageway followed by pedestrians on the defendants’ yard, although they, defendants, have attempted at different times to prevent pedestrians from passing. Despite the attempts, the pedestrians will pass.
There is a large space on this yard taken up with the different tracks. It being level and dry, frequently pedestriáns walked to the depot on these tracks at the place where the young man was killed, and passed over as before mentioned.
One of defendants’ witnesses stated “that there is a great deal of passing of people on foot up and down the right of way where this young man was killed. Yes; people walk up and down here right along. The ground there is pretty well beaten.”
The engineer or hostler who had charge of the engine stated as a witness that he saw the deceased grab the rail on the side of the tender and board the tender.
It is evident that the jury did not attach much importance to the testimony of this engineer. ,If the young man grabbed one.of the rails and boarded the tender, as he, the engineer, stated as a witness, then the conclusion is that he, the deceased, was imprudent to a degree rendering recovery of damages not to be thought of. This is conceded by all parties concerned. But the engineer was not consistent in his statements out of court.
Plaintiffs attacked the statement as incorrect, and base their attack mainly on the fact that the locomotive and tender were running at the rate of only two miles an hour. Why should the young man have gotten on the engine, running at that rate, in order to catch the outgoing train he was anxious to board? is substantially the question presented by plaintiff.
Another ground of attack was that the engineer had made statements not agreeing with those made under oath by him in court. These statements are not consistent. On a material point there is substantial difference. He said to two of the witnesses that he was taking his engine out; saw a man running across the' track, whom he thought was the man killed; that he could not say whether he was caught by the engine or tender, because he was on the side opposite from where the engineer was standing on the engine. To quote from the testimony of this witness in answer to a question as to what the engineer had said:
“Said he had not seen him catch on; the engine was between him and the man.”
This statement of the witness is corroborated by other witnesses to whom he had given an account of the accident.
This issue went to the jury, who presumably knew the witnesses.
The jury impaneled on the first trial failed to agree. On the second trial the verdict was nine in favor of a verdict, and three jurors against the verdict. After having read the testimony bearing upon the particular point before us, we have not arrived at the conclusion that the jury erred in not accepting the account of the engineer, contradicted as it was.
This brings us to a consideration of the other issues presented. The testimony all points to the fact that the young man was killed by engine 85 while backing out, as before mentioned, at the slow rate of speed. He was on his way to the train on which he was a passenger.
There was no one stationed at the end of the tender, on the lookout. Had some one been on the lookout, we infer that he could have avoided the accident. There were two men on the backing engine. Nothing shows *43 that one or the other could not have taken a place on the tender as a lookout.
We infer that the work of the engineer and his fireman is not very exacting when backing an engine and tender from the depot to the barn. The fireman’s work is very little. He might have been on the lookout — or the engineer himself, as to that matter — as one man alone is, we think, equal to running the engine the short distance mentioned above.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be, and the same is, affirmed.
MONROE and PROVOSTY, JJ, dissent.