BLANCHE, Judge.
Plaintiff, Albun A. Reeves, has appealed from the judgment of the trial court dismissing his suit for damages arising out of an accident which occurred on July 16, 1968, when a flat bed truck, which he had parked on a railroad track, and in which he was located in the driver’s seat at the time of the accident, was struck by a backing train.
The trial judge rendered Written Reasons for Judgment summarizing the factual situation, status of the litigation and his findings of fact, in the following manner-
“A truck-train collision which occurred on July 16, 1968 at Humble’s Baton Rouge refinery has precipitated this suit for damages by the injured truck driver, Albun A. Reeves. His claim that he sustained severe and disabling injuries is amply demonstrated by the evidence and the only serious question raised by the suit is the liability vel non of the several defendants.
“Humble in August, 1966, contracted with Foster Wheeler Corporation for construction of a new coking unit west of and adjacent to its existing coking facility.[1] Foster Wheeler in turn had subcontracted with Plant Service for the same work and it was during the course of this construction that the plaintiff,[2] Albun Reeves went to work for Plant Service as a truck driver and worked regularly in this capacity until the date of the accident.
“A railroad spur track which serviced the coke pit ran through the construction area, and on this track empty rail cars were backed into the construction area. Normally, approximately 18 cars were backed in from the east in a westerly direction by a switch engine, and after initial spotting, these cars usually extended several hundred feet west of the coke pit. As evidenced by aerial photographs submitted in evidence,[3] there is a pronounced curve immediately west of and past the coke pit. Therefore, due to the construction and configuration of the track, the engineer of the switch engine pushing the cars could not see whether there were any obstacles in the path of his lead car. Because of the close clearance and in conformity with its Industry Track Agreement with Humble,[4] L & A Railroad did not require a man to ride in the lead car as was the usual practice employed in backing procedures during switching operations.[5]
“The switching of trains servicing the existing coking unit was controlled by Humble by use of a red and green signal light located over the track east of the coking facility. By agreement between Humble and L & A, the switching operation was not to begin until the operator or assistant operator of the coking unit changed the signal light from red to green.
*448 “On. the morning of the accident, the plaintiff was the driver of a truck which was being loaded with wooden forms used in constructing the new coking pit alongside the tracks. Apparently, during the loading operation, and prior to th'e accident, Plank Service personnel decided to replace the ‘cherry picker’ which was being used to load the forms with another one. The testimony on this point is conflicting, but it seems that C. T. Williams who was an operating engineer with Plant Service, asked Reeves to move his truck over so that there would be room to move out the cherrypicker. Reeves complied with this request and parked his truck astraddle the railroad track facing in a westerly direction. While occupying this position, plaintiff’s truck was struck from the rear by the lead car of a string of cars being backed into the area for loading at the existing coking unit. The truck turned over pinning Reeves under it resulting in the injuries complained of.
“Named as defendants are: The Louisiana and Arkansas Railroad, Humble Oil and Refining Company, eight employees of Humble in both supervisory and operating capacities, and Fireman’s Fund Insurance Company and The Employers Surplus Lines Insurance Company, who had policies of insurance covering supervisory personnel of Plant Service.
“Primarily, the railroad’s liability is based upon its failure to maintain a lookout on the lead car and in backing its train into a construction area without giving adequate warning to those persons engaged in construction work. Humble and its supervisory personnel are joined as parties essentially on the basis that they failed to warn the contractor and its employees that trains were using the track in the construction area. Finally, the negligence of Plant Service supervisory personnel is alleged to be that they failed to adequately supervise and schedule movement of men and equipment on and about the railroad track so as to prevent collisions with trains servicing the existing coking unit, and, in particular, in directing the plaintiff to move his truck in a parked position on the railroad track under the prevailing conditions.
“Defendant L & A Railroad denies any negligence on its part and avers that the plaintiff himself was guilty of contributory negligence and, more particularly, the railroad pleads the provisions of its Industry Track Agreement with Humble which it contends vests in L & A contractual rights of indemnity and/or contribution from Humble for any claims made against it. In this regard, L & A has filed a Third Party Demand against Humble seeking indemnity and contribution in the event it should be held responsible for damages for the accident.
“Humble contends primarily that plaintiff has no right of action against it in tort because the contractor and sub-contractor’s work was a part of the regular trade, business and occupation of Humble and as such is governed exclusively by the workmen’s compensation laws of the State of Louisiana, and as shown by the record, the plaintiff has been and is receiving compensation benefits from the compensation insurer of his immediate employer. In the alternative, Humble and on behalf of its employees denies any negligence on its or its employees’ part and avers that the accident was caused by the contributory negligence of Reeves himself.
“Fireman’s Fund and Employer’s Surplus Lines Insurance Companies, of course, deny any negligence on the part of the supervisory employees of Plant Service and also allege contributory negligence on the part of the plaintiff himself. In addition, Employer’s Surplus Lines filed a plea of prescription which was instanter overruled by the court on the trial of the merits.
“After an extensive review and assessment of the evidence, it is the court’s opinion that in order to properly resolve the question of the respective defendants’ liability, first consideration of the serious issue of the plaintiff’s own contributory negligence is dictated. The jurisprudence *449 is overwhelming concerning the care to be exercised by a motorist in regard to crossing and traversing of railroad tracks.
******
“The plaintiff’s actions in parking his truck on the coking spur, and in particular, in facing his truck in a direction away from what was normally the ‘live end’ of the track, evidences to the court a completely oblivious disregard for any hazards or dangers occasioned by possible traffic on the track. To rebut this normal reaction and conclusion, able counsel for the plaintiff have submitted substantial evidence directed to show that Reeves had been lulled into a sense of security by prior events indicating inactivity of rail traffic on the spur. Coupled with this is their argument that Reeves merely responded to a direct order given by his superior that he park his truck on the track and the further suggestion that this was the only feasible location in close proximity available for temporary disposition of the truck.
“In regard to these contentions, it appears that in order to facilitate the construction of the new coke pit, the portion of the coking spur west of the existing coking unit was removed during the early construction phase of the project. This part of the track was not rebuilt until the end of May or approximately six weeks before the accident. During this period there was a ‘stop’ erected near the west end of the old coke pit and it was evident to those working in the vicinity that there was no railroad activity west of that point. It further seems that prior to the removal of the spur and after its reconstruction, a permit procedure was employed by Plant Service when it desired to place men and equipment on the track. Under this procedure, Plant Service’s supervisor would contact Humble’s job coordinator and obtain a time when such activity could be carried on the tracks. It was Humble’s responsibility to notify L & A that construction activity was being carried out on the coking spur. While this • procedure was utilized in numerous instances during the course of the construction of the project, it was evidently well known only to the higher echelon of personnel of Humble and Plant Service because none of the teamster personnel, including Reeves, were aware of the existence of such a procedure.
“After the reactivation of the track in late May of 1968, it is no doubt likely that Reeves did see equipment temporarily situated on the spur track; however, it is difficult to believe that he should have taken this as a license to locate his truck on the track without at least maintaining a lookout for possible rail traffic. In fact, one witness to the accident, Richard Price, observed that he definitely concerned himself with activity on the track and when working on it asked other crafts to flag for him.
“Reeves testified that he did not know the track was back in operation at the time of the collision, although he readily admitted having seen a train bring in some granite for the foundation of the track a few days before the accident occurred. Several of' the plaintiff’s witnesses also testified that they were unaware that the track was back in operation. Be that as it may, an examination of the switch list submitted in evidence[6] shows that on at least 25 occasions during the working hours between May 31, 1968 and July 16, 1968 (exclusive of non-working weekends and holidays) switching operations involving ten cars or more occurred on the spur track at or very near the point where the accident happened. Further, a number of defense witnesses said they were aware that the track was back in use. Consequently, it seems doubtful that an attentive person on the job would not have been conscious that the track had been put back in operation. Perhaps the plaintiff himself struck at the heart of the matter when he testified: T didn’t give the railroad a thought.’
“The court is satisfied after hearing the testimony of the witnesses, particularly of Reeves himself, that no specific direc *450 tive was given him by Williams to park his truck on the track. Rather it appears that Williams indicated for him to park his truck in the general direction of the track and not the track itself. Furthermore, photographs submitted in evidence indicate that while it may have been an inconvenience to park elsewhere, Reeves readily could have moved his truck to another location beside the tracks.
“Therefore, it is the court’s final appraisal of the evidence that although Humble and Plant Service personnel may be subject to a finding of negligence for failing to properly supervise their men and equipment with respect to the operation of the spur track, nevertheless, if the same yardstick of care is required of the plaintiff, he also exhibited a remarkable lack of care for his own personal safety amounting to at least contributory negligence barring his claim.” (Written Reasons for Judgment, Record, pp. 278-283)
Plaintiff urges on appeal that the trial judge committed manifest error in finding him guilty of contributory negligence. Alternatively, plaintiff claims entitlement to judgment in his favor and against defendant, Louisiana & Arkansas Railway Company, under the doctrine of last clear chance.
In support of the contention made on behalf of plaintiff that he was not guilty of contributory negligence, counsel for plaintiff complains that the trial judge misconstrued the testimony of the witness, Clarence Richard Price, about whom the trial judge said that he testified that “he definitely concerned himself with activity on the track and when working on it asked other crafts to flag for him.” (Written Reasons for Judgment, Record, p. 282-A) Counsel for plaintiff contends that all this witness testified to was that he asked other crafts to flag for him only with regard to the position of the load with which he was working as an operator of construction equipment, and that he did not ask other crafts to flag for him so as to protect him from rail traffic. This objection is not well founded, and our review of this witness’ testimony satisfies us that he did unequivocally testify that he was aware of the presence of trains coming in and out on the particular railroad track in question several times during the interval between the reactivation of the track and the accident, and that he did look for trains when he parked on the railroad track, after which he relied on the members of the craft which he was assisting for protection against rail traffic. (Record, pp. 897-918)
The other main complaint urged by counsel for plaintiff in opposition to the trial judge’s finding of contributory negligence is the reliance by the trial judge on the so-called “switch lists,” which were records prepared by Humble employees at the operating coking unit confirming the number of rail cars which were loaded with coke each day. Defendants sought to establish by reference to these switch lists the date on which the railroad track to the west of the operating coking unit was restored to use. The contention by the defendants is that where the switch lists reflect eighteen to nineteen cars having been loaded at one time, this is documentary evidence establishing that on such a date the track located west of the operating coke unit must have been restored and used by Humble in connection with its coke-loading operations, since only in this way could the eighteen to nineteen cars have been loaded at one time. Our review of the record establishes that these switch lists are not sufficiently probative to warrant such a conclusion, inasmuch as at least one of the Humble employees working at the coking unit admitted that he prepared a switch list simply as a composite list of the four to five railroad cars which were loaded at one interval, compiling the switch lists from a personal list of several such intervals where only four to five railroad cars had been loaded at one time. (Record, p. 804)
This one factor, however, does not warrant or support the conclusion that the trial *451 judge committed manifest error in finding plaintiff guilty of contributory negligence, for the reason that the record contains ample testimony given by defense witnesses confirming that the track had been restored to use and that backing trains were frequently seen on the restored track for at least two to three weeks before the accident,[1] as recognized by the trial court.[2] Plaintiff himself admitted that the track had been reconstructed for some two to three weeks prior to the accident, although plaintiff testified he felt the relaid tracks would be used only for the new coking unit which was being constructed. The evidence shows, however, that the plaintiff was in the construction area 90 to 95 percent of his time and had been on the job for some nine months prior to the accident.
From our review of the entire record, we are satisfied that in all probability plaintiff knew that the restored track was being utilized in conjunction with the operation of the existing coking unit located east of the construction site, and, in any event, plaintiff certainly should have known of this situation and the attendant danger, and was guilty of contributory negligence in parking his truck upon the railroad track when it was unnecessary to do so, when he had neither been ordered nor requested to do so,[3] and without taking any precautions or maintaining any lookout whatsoever. We fail to find any manifest error committed by the trial court in concluding that plaintiff was guilty of contributory negligence.
With regard to plaintiff’s alternative contention, that is, entitlement to judgment against defendant, Louisiana & Arkansas Railway Company, under the doctrine of last clear chance, we are satisfied that plaintiff is not entitled to recover under this doctrine, for the reason that he had an opportunity to avoid the accident, which opportunity continued until the moment of impact, had he exercised the slightest degree of care and maintained a proper lookout. The last clear chance doctrine does not apply if the defendant, because of his negligence, has failed to discover plaintiff’s peril in time to avoid the accident, but up to the time of impact plaintiff also had an opportunity to save himself and failed to do so because of his own negligence or continued negligence, Glatt v. Hinton, 205 So.2d 91 (La.App. 4th Cir. 1967), writ refused, 251 La. 861, 206 So.2d 712.
The record in this case clearly evidences the fact that plaintiff indeed had ample opportunity to save himself but for his continued negligence in failing to maintain any lookout or to exercise any degree of regard for his own safety while precariously parked on the railroad track. Indeed, plaintiff had a much better opportunity to avoid the accident then any employees of either Humble or Louisiana & Arkansas Railway Company, all of which employees were located several hundred feet to the east of the accident scene and whose vision of plaintiff’s truck on the track was obscured by the curve therein and by the train itself.
For the foregoing reasons, the judgment of the trial court is affirmed, with all costs of this appeal assessed to plaintiff.
Affirmed.

. “ Exhibit-Humble #31

. “ Exhibit-Humble #32

. “ Exhibit-Reeves #5; Humble #3

. “ Exhibit-L & A #13

. “ Exhibit-Reeves #1”

. “ Exhibit-L & A #22

. See, for example, testimony of Walter R. Pierce, Record, pp. 782-784; testimony of Clarence Richard Price, Record, p. 897; testimony of Landon A. Varnado, Record, p. 1,203; and testimony of Clarence T. Williams, Record, p. 1,246, all of whom were employed by Plant Service Construction Corporation which was also plaintiff’s employer.

. Written Reasons for Judgment, Record, p. 282 — A.

. Written Reasons for Judgment, Record, p. 283.