282 So.2d 503 (1973)
Albun A. REEVES
v.
LOUISIANA AND ARKANSAS RAILWAY COMPANY et al.
No. 52681.
Supreme Court of Louisiana.
August 20, 1973.
Rehearings Denied September 24, 1973.
*505 Kennon, White & Odom, John S. White, Jr., Robert F. Kennon, Jr., Baton Rouge, for plaintiff-relator.
Franklin, Moore, Cooper & Walsh, Charles W. Franklin, M. O'Neal Walsh, Baton Rouge, for defendants-respondents.
William N. Faller, Durrett, Hardin, Hunter, Dameron & Fritchie, Calvin E. Hardin, Jr., Baton Rouge, Milling, Benson, Woodward, Hillyer & Pierson, Guy C. Lyman, Jr., New Orleans, for defendants-appellees-respondents.
Breazeale, Sachse & Wilson, Maurice J. Wilson and Paul M. Hebert, Jr., Baton Rouge, for appellee-respondent.
SUMMERS, Justice.

The factual context
Humble Oil and Refining Company (Humble) is the owner and operator of an extensive oil refinery and chemical plant in East Baton Rouge Parish. Prior to July 16, 1968 Humble contracted with Foster Wheeler Corporation for the construction of a new petroleum boking unit on its premises. Foster Wheeler Corporation, in turn, subcontracted the work to Plant Service Construction Company. Plaintiff Albun A. Reeves was employed as a truck driver by Plant Service.
An existing coking unit was situated east of the work being done by Plant Service on the new unit. A railroad spur track, running generally in an east-west direction, was located north of and alongside pits of the existing coking unit and the unit under construction. As it was processed hot gaseous coke was dumped into these pits and then loaded into hopper cars.
The track curved to the south and terminated 600 feet west of the coking unit. Visibility of the western portion of the spur from the east was therefore impaired by the coking unit structures. The spur track had been used to service the existing coking unit. In this operation, empty hopper cars were backed onto the spur track and spotted west of the existing coking unit. They were then moved forward by a "car hauler" for loading.
While construction on the new coking unit was in its early stages, the track was dismantled and removed. During this period, a "stop" was erected near the west end of the old coke pit, making it apparent to those working in the vicinity that there was no railroad activity west of that point. The track was, however, reconstructed about six weeks prior to the day of plaintiff's injury on July 16, 1968.
A red and green signal light was located east of the existing unit in such a position that trains traveling west could be signaled that the track beyond the curve was either clear (green light) or obstructed (red light). This signal light was operated by Humble under an agreement with Louisiana and Arkansas Railway Company (L & A) styled the Industry Track Agreement. By the terms of that agreement, claims for injuries or damage incurred on the track arising from the joint or concurring negligence of both parties were to be borne by them equally.
The agreement recognized that the coking unit operation required the pits on the south and car hauler on the north to be very close to the tracks. At the same time, L & A's operating regulations required someone to ride the lead car of a backing train to serve as lookout. Because of the design of hopper cars, the lookout generally *506 rode the side ladder of these cars in such a manner that he could observe the track ahead and warn the locomotive engineer of track obstruction.
The impingements on the usual track clearance caused by the coke pits and the car hauler made it impracticable for anyone to ride the side of the lead car as a lookout when the train backed along the spur from east to west. A person in this position would be raked off the side ladder by the coke pit structure on one side and by the car hauler on the other. Riding on the front end of the lead car involved the hazard of being run over if the lookout fell onto the track. Posting a lookout atop a hopper car was considered impracticable by L & A because of the car's design.
Humble assumed the responsibility of installing and maintaining in good condition at all times signs, lights, tell tales and all other warning devices to prevent injury to persons which might occur because of the limited track clearance resulting from the proximity of the coke pits and the car hauler arm.
During the morning of July 16, 1968, plaintiff was driving a flat-bed truck for Plant Service. The truck was being loaded at the new coking unit with wooden forms from a pit alongside the track. C. T. Williams, the operating foreman for Plant Service, decided to move a "cherrypicker" being used to load the truck to a location near the new coking unit and to replace it with another. Because the truck driven by plaintiff was positioned near the railroad track in such a manner that it obstructed the path over which the "cherrypickers" would be moved, Williams directed plaintiff to move his truck to the west of the new coking unit. In complying, plaintiff drove the truck in a westerly direction, and parked with the truck straddling the track and facing westward. From this position he waited in the truck cab for further instructions.
About ten or fifteen minutes later, while plaintiff was parked, a train owned and operated by L & A, consisting of a locomotive and 18 empty hopper cars, backed around the sharp turn of the spur track from the east. It proceeded westward until the lead car collided with the rear of the truck. The impact overturned the truck, throwing plaintiff partially from the cab. Before the train could be stopped, plaintiff and the truck were dragged approximately 150 feet. As a result, plaintiff suffered severe and disabling injuries.
This suit was instituted by plaintiff to recover damages in the sum of $442,545 for personal injuries, loss of earnings, medical expenses, etc. He named as defendants: Humble, together with certain of its employees in a supervisory or operating capacity associated with the events leading to plaintiff's injuries; L & A; Fireman's Fund Insurance Company and the Employer's Surplus Lines Insurance Company, liability insurers of Plant Service's supervisory personnel.
Both the trial court and Court of Appeal found plaintiff guilty of contributory negligence barring his recovery. Plaintiff's suit was dismissed at his cost. 263 So.2d 446 (La.App.1972). Certiorari was granted on plaintiff's application. 262 La. 1102, 266 So.2d 424.
Plaintiff should recover, and the judgments of both courts are reversed.

The issues
Humble's negligence is primarily alleged to be its failure to have warned the contractor and its employees that the train would use the spur track in the construction area, and its having given the green signal without ascertaining that the track was clear. Plaintiff maintains L & A was negligent because of its failure to have maintained a lookout on the lead car, and because of its having backed its train into the construction area without warning the construction workers.
And, finally, the negligence of the Plant Service supervisory personnel is said to *507 consist of their failure to have adequately supervised and to have properly scheduled movement of men and equipment on and about the railroad track to prevent accidents with trains servicing the existing coking unit, and, particularly, in having directed plaintiff to move his truck onto the spur track under the circumstances.
Plaintiff's contributory negligence is asserted by all defendants.
Humble denied plaintiff's right to proceed against it in tort. The theory of this defense is that the contractor and subcontractor's work was part of Humble's regular trade, business and occupation, and for this reason plaintiff's remedy is limited exclusively to workmen's compensation. As the record makes clear, plaintiff is receiving maximum benefits under the workmen's compensation law from Plant Service's compensation insurer. Alternatively, Humble denied its negligence and entered a plea for itself and its employees alleging plaintiff's contributory negligence.
L & A pleads the provisions of its Industry Track Agreement with Humble which it contends vests in L & A contractual rights of indemnity and/or contribution from Humble. To assert these claims L & A filed a third party demand against Humble seeking indemnity and contribution in the event it should be held for damages.
In defending Plant Service's supervisory personnel, Fireman's Fund and Employer's Surplus Lines Insurance Companies deny negligence of the employees, and plead plaintiff's contributory negligence. A plea of prescription filed by Employer's Surplus Lines was overruled at the trial. Employer's also denied coverage under the insurance contract.

I.
The contention that plaintiff cannot sustain a tort recovery against Humble is without merit. This contention is grounded upon the theory that Humble is a statutory employer and plaintiff's exclusive remedy is under the Workmen's Compensation Act. It is argued that the work performed by plaintiff's employer, Plant Service, was part of Humble's trade, business or occupation. To support this position, Humble invokes the provisions of Section 1061 of Title 23 of the Revised Statutes.[1]
The evidence offered by Humble to support this special defense did not sustain its burden of proof. The work being done at the time was not part of its regular business. Humble is primarily an operating or refining company. It has never designed a coking unit or any comparable plant. It has neither the design capability nor the manpower availability for this type work. Most of its new construction is let to independent contractors as in this case. The new coking unit was being built alongside the existing unit which had also been contracted with Foster Wheeler Corporation *508 in 1962. A majority of the 1,200 employees in Humble's mechanical division are engaged in maintenance work.
Thus, it was not Humble's business practice to engage in new construction of this type and magnitude, nor does the record support a conclusion that this type work was customarily done by Humble or other employers similarly situated. The record does not support a conclusion that Humble is a statutory employer. See Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950) and Horrell v. Gulf & Valley Cotton Oil Co., Inc., 15 La.App., 603, 131 So. 709 (1930).

II.
On the day plaintiff was injured, Humble employees were operating the signal light east of the coking unit. As the L & A train approached, Humble's employees turned the green light on. This signaled the trainmen that the spur track was clear, for the train's engineer could not see around the coking unit or the curve. No check had been made by either Humble or L & A employees to determine whether the spur was clear beyond the coking units. Nor was it their practice to do so despite the fact that the danger of such an operation had been recognized by Humble's coking unit supervisor, the coking unit operator and the job co-ordinator. Moreover, no prior warning had been given to Plant Service or its employees that cars would be switched onto the spur; no schedule of rail car movements had been provided, and no effort had been made to explain the signal light procedure Humble was using.
With the signal tower showing a green light, the L & A locomotive pushing the 18 empty hopper cars proceeded around the curve. The train had no lookout. At the time, the noise of the coking unit operation, the construction activity and the fact that the locomotive was eighteen cars away made approach of the train difficult to detect except by sighting. As one witness observed, it was hard to tell when the rail cars were "slipping" along the track. Actually, the train proceeded blindly into an area where an obstruction on the track could reasonably have been expected and foreseen.
Other than trains hauling ballast and other material for reconstruction of the track, plaintiff was unaware of any use of the spur during the time he was in the construction area. He had parked his truck on the track "many" times to load and unload material. The track site had been frequently used to maneuver the truck and to turn it around. In the mornings, plaintiff often backed onto the track to assist the laborers in "putting out" the water coolers. On numerous occasions, when he was required to park on the track, plaintiff remained there as long as an hour or more.
Other trucks, bulldozers and cherrypickers also parked on the track or crossed it in connection with the construction activity. As already noted, it had been necessary to remove the track during part of the work to permit excavation under the tracks. After the tracks were replaced, construction continued with men and equipment routinely going back and forth over them. These practices lulled plaintiff into a belief that parking on the track was permissible and acceptable conduct.
In addition, the supervising personnel on the job acknowledged that during the course of the construction it had frequently been necessary to place men, trucks and other equipment on the tracks.
Although a permit procedure had been established whereby Plant Service would obtain permission from Humble to obstruct the track, the men actually working on and around the track were unaware of the procedure. As a practical matter, the procedure was inapplicable to temporary or transient truck parking situations.
Despite the obviously dangerous situation, no effort was made by either J. Logan Price, Humble's coking unit supervisor, or by Robert L. Shanks, the coking *509 unit operator, or by Harold Trouard and Alvin Hanks, the Humble job coordinators, to warn Plant Service or its personnel when to expect trains on the spur.
Under these facts plaintiff's status on Humble's plant site was admittedly that of an invitee. Humble, as owner of the premises where the work was being done by Plant Service, and its employees had a duty, therefore, to use reasonable, ordinary or due care under the circumstances toward one working on its premises for its benefit and with its consent. Litton v. Travelers Insurance Co., 88 F.Supp. 76 (W.D.La.1950); Reboni v. Case Brothers, Inc., 137 Conn. 501, 78 A.2d 887 (1951); Lincoln v. Appalachian Corp., 146 La. 23, 83 So. 364 (1919); Simoneaux v. Copolymer Rubber & Chemical Corp., 189 So.2d 745 (La.App.1966); Turner v. Continental Southern Lines, Inc., 161 So.2d 139 (La. App.1964); 65 C.J.S. Negligence § 63 (113); 62 Am.Jur.2d, Premises Liability, §§ 41, 50, 58, 121.
Humble and its employees breached this duty of care by failing to post signs at or near the track warning that trains would be using it; by failing to see that the track was clear before the L & A train was signaled to proceed; and, specifically, by not warning plaintiff and others at the construction site of the approach of the backing train.

III.
The negligence of L & A is likewise apparent. No lookout whatever was kept by the railroad's employees operating the train. No whistle or bell was sounded to warn of the train's approach. And L & A's supervisor had knowledge that Humble's green signal was given without Humble's employees having ascertained that the spur track was clear of vehicles and workmen. He should have known, therefore, that Humble's signal was inadequate to afford protection to persons and vehicles who parked upon and traversed the spur track.
It is negligence to blindly back a train into an area of construction activity where the track itself was often traversed by construction vehicles, or where the drivers of those vehicles sometime parked on the track in the course of their duties. Under these circumstances, it was imperative that this train, backing around a blind curve with 18 cars ahead of the locomotive, be provided with a lookout. Willis v. Vicksburg, S. & P. Ry., 115 La. 53, 38 So. 892 (1905); Lampkin v. McCormick, 105 La. 418, 29 So. 952 (1901); Hamilton v. Morgan's L. & T. R.R. & S.S., 42 La.Ann. 824, 8 So. 586 (1890).
The operating rules applicable to L & A recognize the need for a lookout on the lead car; and the engine foreman, locomotive engineer and one of the railroad officials acknowledged the existence of the rule. Nevertheless, L & A did not require or even permit its employees to ride or walk ahead of backup movements past the coke plant.
Though it must be acknowledged, as the railroad urges, that riding on the front of the lead car or walking ahead of it involved certain danger to its employees, a railroad must bear the consequence for having failed to take this precaution to avert colliding with others known to be endangered by the omission. Willis v. Vicksburg, S. & P. Ry., supra, Lampkin v. McCormick, supra; and Hamilton v. Morgan's L. & T. R.R. & S.S., supra.

IV.
Plaintiff was not guilty of contributory negligence which bars his recovery. If plaintiff was guilty of any negligence in parking his truck on the track, a questionable conclusion considering the circumstances of this case, his negligence would not constitute an active, proximate cause of the resulting collision and damage.
*510 And parking on the track gave no cause for the railroad to literally run him down by its inattention to the obligation to maintain a proper lookout.
Assuming arguendo that plaintiff was negligent, his negligence in parking on the spur track was passive, too far removed in point of time from the events leading directly to the collision. Fifteen minutes elapsed from the time he stopped until the train collided with his truck. Secondly, no reasonable person could foresee that parking a truck on this spur track would result in a train running into the truck in utter disregard of the safety of the truck's occupant.
In such cases the technical negligence attributable to parking on the track becomes a passive cause, too remote in point of time or sequence of events to remain viable in legal contemplation. Instead, the subsequent negligent conduct, intervening between the original negligent act and the resulting wrong, is more proximately related to the injury. This latter negligence, then, puts in motion a new chain of events, and becomes the independent and primary cause of the injury flowing directly therefrom, making the actor chargeable with all legal responsibility for the consequences. Theunissen v. Guidry, 244 La. 631, 153 So. 2d 869 (1963); Townsend v. Missouri Pac. R.S., 163 La. 872, 113 So. 130 (1927). See also Spiers v. Consolidated Companies, 241 La. 1012, 132 So.2d 879 (1961).
Applying these principles to the facts of this case, plaintiff's conduct was not a legal cause of the collision and the damage resulting therefrom. Nor did parking on the track contribute in law to the collision and damage. Instead, failure of Humble and L & A to warn the construction workers that a train would back into the area, failure to take proper precautions to see that the spur was clear, imprudently activating the green light and failing to post a lookout for the backing train as it rounded a blind turn were preponderately the immediate and primary causes of the collision.

V.
Humble and L & A each assert that their responsibility to plaintiff is governed by the Industry Track Agreement, and the green light procedure which had been observed by them. Humble asserts the green light procedure did not impose a duty on Humble to see that the track was clear of vehicles and personnel. Instead Humble claims that the green light procedure was adopted to govern the relations between Humble and the railroad with respect to the operation of the coking unit only. The green light meant, according to Humble, only that the cars were ready to be pulled out, the crane was clear of the cars, the car hauler hydraulic loading arm was up, and there was no gas in the area.
On the other hand, L & A contends the duty it owed plaintiff was satisfied in that the trainmen had acted in accordance with the so-called green light procedure, reliance upon which was consistent with the Industry Track Agreement stipulating that Humble "require its employees ... to notify the employees of Railway Company that the employees of Industry are using or working upon the railway track."
In our view, however, Humble and its employees on one hand, and L & A on the other, were both negligent and their negligence combined to bring about plaintiff's injury. Their joint and concurring negligence was the proximate cause of the injury and damage suffered by plaintiff. Dixie Drive It Yourself System, Inc. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). Thus, they are liable in solido to plaintiff. La.Civil Code arts. 2103, 2104, 2324.
As between themselves, we believe the respective responsibility of Humble and L & A is governed by the Industry Track *511 Agreement providing that claims for injuries or damage incurred on the track arising from the joint or concurring negligence of both parties are to be borne by them equally. The Industry Track Agreement could have no effect upon their responsibility to plaintiff. They could not contract away their negligence when plaintiff was not a party to the agreement. La. Civil Code arts. 11, 2324; Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955); Hayes v. Hayes, 8 La.Ann. 468 (1853).

VI.
Fireman's Fund and Employer's Surplus Lines Insurance Companies were sued as insurers of Walter Pierce, Landon Varnado and C. J. Williams, supervisory employees of Plant Service. Each insurer entered a special plea alleging plaintiff's contributory negligence. Employer's Surplus Lines asserts a defense of lack of coverage and prescription. However, since Plant Service's supervisory personnel have not been found to be responsible for plaintiff's injuries and damage, these issues are not relevant to this suit's outcome.
Plaintiff was employed by Plant Service, an employer engaged in a hazardous business. He has received workmen's compensation payments for his injuries incurred during the course and scope of his employment. Fireman's Fund, the workmen's compensation insurer, who has intervened, is entitled to recover from the funds awarded to plaintiff the amounts paid as compensation.

VII.
It has been this Court's policy to remand for the purpose of fixing the damages to which a plaintiff is entitled when the trial and appellate courts have not had an opportunity, or have found it unnecessary, to consider the question in disposing of the controversy. Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971); Felt v. Price, 240 La. 966, 126 So.2d 330 (1961).
For the reasons assigned, the judgments of the trial court and Court of Appeal are reversed, and the case is remanded to the First Circuit Court of Appeal to determine the amount of the award to which plaintiff is entitled. Judgment is to be rendered in plaintiff's favor in such amount and otherwise in conformity with the reasons assigned herein.
SANDERS, C.J., concurs in the decree.
BARHAM, J., concurs rejecting the opinion"s holding plaintiffs contributory negligence to be passive. The result is correct on other grounds.
MARCUS, J., dissents with reasons.
MARCUS, Justice (dissenting)
I respectfully dissent.
The trial court and the Court of Appeal found plaintiff guilty of contributory negligence and barred his recovery. I agree with this finding. I find plaintiff at the very least contributorily negligent, which negligence was a proximate cause of the accident.
A brief review of the facts in this regard will make this conclusion abundantly clear.
Plaintiff had been employed in this construction area for some eight or nine months before the date of the accident. He had spent 90 to 95% of his time in the area. Plaintiff presented evidence to show that he had been lulled into a sense of security by prior inactivity of rail traffic on the spur, and that he had merely responded to a directive of his superior when he parked his truck on this track.
It should be pointed out in this regard that, during the construction of the new coke pit, the coking spur track west of the existing coking unit was removed during the early construction phase of the project. *512 There is a dispute as to when this track was rebuilt. The trial judge found that it had been rebuilt approximately six weeks before the accident, whereas the Court of Appeal concluded that the track had been restored for only a period of two to three weeks prior to the accident. After a review of the record, I concur in the finding of the Court of Appeal and conclude that the coke spur track had been restored for a period of at least two to three weeks. L & A, at this time, resumed normal switching operations whereby it periodically delivered full compliments of empty cars to the coke plant and shoved them all at one time into position on the spur track. Accordingly, rail cars, sometimes as many as nineteen, for at least two or three weeks before the accident, were being spotted in the area. The switch list for the three-week period June 27, 1968 to July 16, 1968 (the date of the accident) shows that 379 rail cars moved in and over the position of the railroad track here involved, and for the period July 1, 1968 to July 16, 1968, 298 rail cars moved in and over this track. It appears to me that, with this number of rail cars in the area during the period, it should have been sufficient to alert a competent truck driver as to the danger of aimlessly parking on the railroad track. Plaintiff admitted that he had known the railroad tracks had been replaced in the construction area for two or three weeks. He also testified that, not over two weeks before the accident, he had seen the railroad tracks in actual use by an I.C. train, which had come into the area from the west (whereas the cars which struck plaintiff's truck came in from the east).
However, he admitted that on the day of the accident he made no attempt to maintain any lookout whatsoever because he did not think about any trains. Several times in the course of his testimony, he stated that he did not keep a lookout for trains and he was not concerned with that possibility. His testimony can best be summed up when he said: "I didn't give that railroad a thought. I parked on the railroad track practically every day and like I say I didn't think about a train or a railroad track either."
On the date of the accident, plaintiff spent from fifteen minutes to half an hour parked on this track. Prior to the collision, he left his truck completely unattended while he got a drink of water and carried on conversation with other employees at a water cooler some 75 to 100 feet away from his truck. When plaintiff did return to his truck, he sat in the cab facing to the west, with his back to the eastern portion of the track from which the train entered.
Plaintiff called other truck drivers to corroborate his testimony that he had seen no trains in the area. However, their testimony, as well as plaintiff's, is difficult to believe in the light of the other evidence which clearly indicates the constant presence of trains in the area immediately preceding the date of the accident. The record contains testimony given by defense witnesses confirming that the track had been restored to use and that backing trains were frequently seen on the restored track for at least two to three weeks before the accident. This testimony is more credible in the light of all the evidence presented.
In connection with the claim that plaintiff parked his truck on the railroad track as a result of being directed to do so by C. T. Williams, neither plaintiff nor Williams so testified. The testimony of Williams was to the effect that he asked plaintiff to move his truck so that the cherrypicker could be changed. He did not direct plaintiff precisely where to move his truck, nor did he show or point out the way for this movement. Plaintiff himself did not testify that Williams told him to park on the track. On the contrary, plaintiff states several times in his testimony that Williams simply told him to pull his truck "over there." It is apparent, after a review of the record, that the decision to park upon the track was that of plaintiff, without such direction from Williams.
*513 Considering these factors, it is difficult for me to understand why plaintiff parked his truck on the railroad track completely oblivious to the existing danger. This act was in utter disregard of his own safety. It should be noted that plaintiff, sitting in the cab of the truck, could have seen the approach of the train through his rearview mirror had he looked.
There is testimony to the effect that there were other locations available for plaintiff to park his truck other than straddling the track. It might have been inconvenient for him to park elsewhere, but certainly safer and more prudent under the circumstances.
For the foregoing reasons, I conclude that plaintiff either knew or should have known that the railroad track had been reactivated in the construction area on the date of the accident. Furthermore, plaintiff made his own decision to park on the track, whereas it was unnecessary for him to have done so. Therefore, I am of the view that the parking of his truck on the track under these circumstances constituted contributory negligence on his part, which negligence was a proximate cause of the accident.
Accordingly, I would dismiss plaintiff's suit as did the courts below.

ON MOTION FOR REHEARING
PER CURIAM.
In their motions for rehearing, two of the applicants have requested that we clarify the Court's decree as to the defendants against whom judgment was rendered.
As indicated in the opinion, judgment for plaintiff was rendered only against Louisiana & Arkansas Railway Company and Humble Oil & Refining Company, in solido. The third party demand of Louisiana & Arkansas Railway Company was rejected.
The motions for rehearing are denied.
NOTES
[1] La.R.S. 23:1061 provides:

"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.
"Where the principal is liable to pay compensation under this Section, he shall be entitled to indemnity from any person who independently of this Section would have been liable to pay compensation to the employee or his dependent, and shall have a cause of action therefor."