BOWES, Judge.
On April 27, 1985, the petitioner Ray James Mouton was employed as a nuclear security officer by The Wackenhut Corporation (hereinafter “TWC”). Since 1981, TWO had contracted with Louisiana Power and Light Company (hereinafter “LP & L”) to provide security force service personnel for the Waterford III nuclear facility owned and operated by LP & L in Taft, Louisiana. Mouton’s petition alleges that while assigned to the Waterford III facility, and during his employment, he sustained a severe back injury while manually operating a malfunctioning electrical vehicle security gate known as the “vehicle trap.” TWC’s insurer has paid worker’s compensation benefits and medical expenses.
On April 1, 1986, petitioner Ray James Mouton, individually and as administrator of his minor son Brad A. Mouton and Sherry Orgeron Mouton filed suit in tort against the defendant LP & L alleging that the injuries he sustained were caused by the negligence of LP & L. The acts of negligence complained of consisted of improperly maintaining the premises in failing to maintain or repair the electrical vehicle gate after notice thus requiring Mouton to manually operate it. Alternatively, the petitioner alleged that LP & L was strictly liable to him as the defective gate was unreasonably dangerous in normal use.
Subsequently, LP & L filed an answer in which it affirmatively pled the defense that it was Mouton’s statutory employer under La.R.S. 23:1061;[1] thus, Mouton’s exclusive remedy against it was for worker’s compensation, R.S. 23:1032.[2] Thereafter, LP & *1116 L filed a motion for summary judgment asserting that Mouton was its statutory employee on the date of his injury and, as such, LP & L is immune from liability ex delicto. In support of its motion, LP & L attached the affidavit of A.D. Haase, Security Superintendent at the Waterford III plant, with other memoranda. In opposition, the petitioner filed a memorandum and affidavit. The TWC-LP & L security force contract (hereinafter “the contract”) was also made part of the record.
The trial court granted the motion and rendered judgment on October 31, 1988, on the basis of Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986), finding no genuine issues of material fact, and that, as a matter of law, LP & L was Mouton’s statutory employer. It is from this judgment that the petitioner has filed this de-volutive appeal.[3] We affirm.
Appellant avers that it was error to grant the summary judgment because there were contested issues of material fact, namely: (1) The contract work performed by Mouton was specialized, and (2) it was not part of LP & L’s “trade, business or occupation”, thus precluding a finding of statutory employment status as a matter of law.
A summary judgment must be rendered “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” LSA-C.C.P. art. 966 B.
We hold that under the facts of this case and the principles enumerated in Berry, supra, LP & L is the statutory employer of Ray James Mouton and, as such, appellant’s sole remedy against it is in worker’s compensation. LP & L is therefore not amenable to a suit in tort by Mouton in this ease.
STATUTORY EMPLOYMENT
Almost 40 years ago, in Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950), the Louisiana Supreme Court announced the doctrine of the principal’s immunity in tort from claims by employees of their contractors. In certain instances, employees of contractors would be considered employees of the principal. Later codified in 1976[4], the doctrine of statutory employment has presented problems in delineating factors which suggest the existence of a statutory employment relationship. In interpreting the- provisions of LSA-R.S. 23:1061, notably those instances in which a contractor was performing work which was part of the principal’s “trade, business or occupation,” the courts looked to whether the contract work was an integral part of the principal’s trade, business or occupation. Thibodaux, supra; Barnes v. Sun Oil Co., 362 So.2d 761 (La.1978). As the “integral part” test led to an expansiveness in interpretation not initially envisioned by the judiciary, eventually a shift toward a more restrictive application of the doctrine of statutory employment began to appear. Lewis v. Exxon Corp., 441 So.2d 192 (La.1983); Benson v. Seagraves, 436 So.2d 525 (La.1983); Rowe v. Northwestern Nat’l. Ins. Co., 471 So.2d 226 (La.1985), (Lemmon, J. concurring).
In 1986, the Louisiana Supreme Court, in Berry v. Holston Well Service, Inc., supra, reiterated some of the principles enunciated in Benson, Lewis, and Rowe, supra, and articulated a three-tier analysis useful in determining whether a statutory employment relationship exists between an owner or principal and his contractor’s employee, and stated:
In the first level, the primary focus is on the scope of the contract work. “The *1117 specific task to which an individual employee is put should not be determinative of his coverage under the Act. Instead, the entire scope of the work contract must be considered.” Lewis, supra, citing Malone, Principal’s Liability for Workmen’s Compensation to Employees of Contractors, 10 La.L.Rev. 25 (1949). The central question to be answered is whether the contract work is specialized or non-specialized. This of course is a question of fact, and courts should consider whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. If it is determined that the contract work is specialized per se, as a matter of law the work is not a part of the principal’s trade, business or occupation, and the principal is not the statutory employer of the specialized contractor’s employees. Id., 488 So.2d at 987, 938. [Emphasis supplied]
In the instant case, the scope of the contract entered into by LP & L and TWC is to provide security force personnel "whose duty it is to protect the Owner’s site from sabotage and theft of nuclear materials and to implement the Owner’s site security program.” Contract Sec. 2(s). Specific duties of security force personnel, however, appear to be no greater than “security tours and inspections, access, control, searches of personnel, packages and vehicles, escort functions, record-keeping and appropriate response to security incidents.” Id. Although the specific task to which Mouton was put is not determinative of his coverage under the Act, under Berry, supra, we are not foreclosed from this factual inquiry.
LP & L, as an operator of a nuclear power plant, is obligated to the U.S. Nuclear Regulatory Commission to provide a security force to protect the Waterford III nuclear power plant. In conformity with federal regulations, LP & L devised a “security plan” and entered into a contract with TWC for the purpose of implementing the plan.
Appellant argues that the contract work is specialized per se because the work of a nuclear power plant security force employee requires “a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field,” Berry, supra; that as a matter of law the contract work is not part of LP & L’s trade, business or occupation; and that LP & L is not his statutory employer. Appellant also argues that the trial judge, in his reasons for judgment, incorrectly compared his skill, abilities, and training with that possessed by other employees within the same contract field, thereby reaching the erroneous conclusion that Mouton’s work was non-specialized. The Judgment with Reasons provides in part:
Initially, Mr. Mouton’s job seems to require a higher degree of training and education than an average security officer’s job. However, the contract field in question is ‘nuclear power plant security’ not ‘average security service’ which a security officer at a shopping center might provide. In the contract field of ‘nuclear power plant security service’, Ray Mouton’s job requires no greater training or education than any average security officer’s job in a nuclear power plant. Thus, Mr. Mouton’s job can not be classified as ‘specialized per se’. Concluding that Mr. Mouton’s job is not ‘specialized per se’ is the first step is [sic] establishing that a statutory employment relationship exists.
In comparing Mouton’s abilities and training with that possessed by others outside of the contract field of nuclear power plant security service, the pertinent question is which group of employees are outside of the contract field?
In Cantrell v. BASF Wyandotte, 506 So.2d 793 (La.App. 1 Cir.1987), writ denied, 512 So.2d 1178 (La.1987), the court held that a contractor’s security service employee who was injured while working as a security guard at the defendant’s manufacturing plant was not specialized per se because “[t]he undisputed fact that defendant directly employed security supervisors evidences that the work is non-specialized.” *1118 Id. at 795. Although Cantrell, supra, did not directly reach the issue, it appears that those “inside” of the contract field were the employees of the contractor and those “outside” of the contract field were considered to be employees directly employed by the defendant manufacturer in security supervisory capacities. As in Cantrell, supra, LP & L directly employs six security supervisors, all of whom outrank the TWC employees.
We agree with LP & L that if the contract field can be said to be “nuclear security”, Mouton possessed no greater degree of skill, training, experience, education and/or equipment than that possessed by security guards outside of “nuclear security.” Certainly, such fields as “industrial security” and law enforcement employ persons with superior skills to those that Mouton possessed. In those fields, bomb threats and emissions of deadly chemicals create security problems, and industrial sabotage and spying are problems in many technical industries.
The record reveals that Mr. Mouton was employed by TWC on February 5, 1984, as a security guard trainee. After employment, he underwent a six-week training course to qualify as a “Watchperson”, and, on March 2, 1984, was awarded a certificate of achievement from TWC and LP & L for successful completion of the Nuclear Watchperson Training Program. He was then assigned to duty as a “Watchperson.” The contract entered into by LP & L and TWC describes a “watchperson” as follows:
2.3.7 WATCHPERSONS
Watchpersons are unarmed, LP & L employees (normally) under the direct supervision of Security Force Personnel when they are performing security related duties. Their duties will include, but are not limited to, manning security posts; escort duty; conducting searches of vehicles, packages and personnel; maintaining security post documentation; effecting traffic control; writing appropriate reports; and understanding all appropriate security rules, regulations, and procedures.
Subsequently, Mouton completed a second six-week on-the-job training course in order to qualify as a security officer. He was thus employed on the date of his injury. The duties of a security officer at the Waterford III facility are similar to any industrial or security guard. The LP & L-TWC contract describes Mouton’s duties as follows:
2.3.4 SECURITY OFFICERS (GUARDS)
Security Officers shall be armed, uniformed members of the Security Force. Their specific duties, as prescribed in the Owner’s security procedures, shall include, but not be limited to:
a. Controlling entry to and exit from the plant protected area.
b. Issuing badges to and maintaining accountability of all persons entering the plant protected area.
c. Patrolling plant property.
d. Maintaining required logs, records, and reports.
e. Conducting searches of personnel, packages and vehicles entering or exiting the plant protected area.
f. Operating and performing tests of communications and security system equipment.
g. Inspecting doors, locks, alarms, gates, etc., as required by the Owner’s security program.
h. Apprehending violators and intruders as required.
i. Performing duties as required by and in accordance with site security procedures, plans, and applicable rules and regulations.
Although Mouton’s specific tasks are not determinative of his status, Lewis, supra, we notice these facts contained in the record in addition to and following our consideration of the entire scope of the work contract.
Mr. A.D. Haase, an LP & L employee, was the Security Superintendent for LP & L at the Waterford III plant and was responsible for supervision of the entire security department at Waterford III at the time of his affidavit. He was an LP & L employee and security control supervisor *1119 on the date of Mouton’s injury. The facts contained in the affidavit and in the contract show the following:
That all security force LP & L and TWC personnel receive identical training and that TWC personnel are not given training beyond the scope of that given to LP & L personnel. The equipment which all security force personnel are required to utilize is provided by LP & L. The equipment consists of a weapon, leather gear, flashlight and flashlight holder, night stick, night stick holder, handcuff case, and boots. Mr. Mouton received two six-week periods of on-the-job training.
Nevertheless, Section 1.20(a) of the LP & L-TWC contract provides:
CONTRACTOR’S EMPLOYEES
Attention is called to the fact that certain portions of the work calls for workmen skilled not only in their trade but specialized in the particular line required. The Contractor shall provide that such work shall be done by personnel who are skilled and specialized in the work to which they are assigned.
Considering the record as a whole, and under the facts of this case, we do not find that Mouton was a “workman skilled not only in his trade but specialized in a particular line.” Considering the scope of the contract work, Lewis, supra, and comparing it to work outside of the contract field, Berry, supra, we do not find that the contract work was skilled and specialized.
Having determined that the TWC contract work is non-specialized, we move to a consideration of the second tier of the statutory employment analysis. The court in Berry stated:
If it is determined that the contract work is non-specialty, then the inquiry shifts to a comparison of the principal’s trade, business or occupation and the contract work to see if the latter can be considered a part of the principal’s trade, business or occupation. The jurisprudence has forged several guidelines, in no way exhaustive, which can aid a court in resolving this factual issue:
(1)Is the contract work routine and customary? That is, is it regular and predictable? Nonrecurring or extraordinary constructions and repairs usually are outside the scope of the statute. On the other hand, general maintenance and repair work, which by their very nature allow the smooth and continued operation of the principal, are within the scope of coverage. Lewis, supra; Benson, supra; Barnes, supra; Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503 (La.1973).
(2) Does the principal have the equipment and/or manpower capable of performing the contract work? This is a sub-species of the specialty inquiry, supra. Here the primary focus is on determining whether the contract work as relates to the principal is handled ordinarily through employees. Lewis, supra, citing 1C. A. Larson, The Law of Workmen’s Compensation, § 49.12, at 9-41 (1982).
(3) What is the practice in the industry relative to the contract work? Do industry participants normally contract out this type of work or do they have their own employees perform the work? See Reeves, supra; Brown v. Kaiser Aluminum and Chemical Corp., 289 So.2d 524 (La.App. 1st Cir. 1973), writ not considered, 293 So.2d 171 (La.1974); Malone & Johnson, supra, § 126, pp. 252-53, fn. 91.
These guidelines are not absolute or rigid, but are instead to be applied relatively, taking into consideration the size, complexity, integration (either horizontal or vertical), or the lack thereof, etc. of the principal. What may be nonrecurring to a small concern, may for an industry giant be regular. Similarly while the type of contract work may be non-specialized (i.e. manual labor), for a small concern it may well be beyond the expertise or capability of its employees. 1 A. Larson, Workmen’s Compensation for Occupational Injuries and Death, § 49.13 (Desk ed. 1985). Basically, the factors developed by the jurisprudence strive to answer the overriding question of “whether [the contract work] is, in that business, normally carried on through *1120 employees rather than independent contractors.” Id. (emphasis added)
Id. at 938.
According to the affidavit of A.D. Haase, Security Superintendent at the LP & L Waterford III plant, the security force composed of both LP & L and TWC personnel are on duty seven days per week, twenty-four hours per day, which allowed the smooth and continued operation of the facility. Security service is essential to the operation of a manufacturing plant. Sandifer v. Crown Zellerbach Corp., 470 So.2d 483, 484 (La.App. 1 Cir.1985), writ denied, 475 So.2d 357 (La.1985); Cantrell v. BASF Wyandotte, supra. Security service is an ordinary and recurring activity at the Waterford III plant and mandated, by federal, state and local laws and regulations.[5] TWC was engaged in a continuous integrated security operation with LP & L for five years prior to Mouton’s accident. LP & L’s personnel were trained along with TWC personnel.
We agree with the trial judge who concluded that:
Thus, this Court finds that the LP & L employees and Ray Mouton were doing similar work at the time of his injury, which also indicates that a statutory relationship exists.
Also, there is additional case law which buttresses our opinion. In Sandifer v. Crown Zellerbach, supra, 470 So.2d at 484, the court found that a security guard was the statutory employee of the manufacturing plant. In that case, the manufacturing plant provided security by using its own employees as well as the contractor’s guard service employees.
The court in Cantrell v. BASF Wyandotte, supra, 506 So.2d at 795, considering a similar factual situation as the instant case, wherein the defendant directly employed security supervisors and contracted for non-supervisory personnel, looked to the entire scope of the work contract and concluded that the plaintiff’s work was part of the defendant’s trade, business or occupation at the time of injury. There, the specific job plaintiff performed had always been contracted out, but, following Berry, supra, the court held that the specific task of the plaintiff was not determinative.
Considering the entire scope of the work contract in the instant case, we believe that the contract work of nuclear security services at the Waterford III plant is ordinarily performed through a mix of LP & L and TWC employees. In addition, LP & L provides all of TWC’s employees’ equipment, which is identical to the equipment provided to its own employees.
Relative to the contract work, the affidavit of A.D. Haase recites:
“That he has attended seminars and conferences between utilities providing nuclear power and to his knowledge the industry practice with regard to staffing of nuclear security forces is varied and consists of total in-house security, and total contract security, and every variation between, including that practiced by LP & L at its Waterford III facility.”
As the contract work in the nuclear power plant industry may be normally carried on through employees of their own or independent contractors, Berry, supra, we believe that LP & L’s practice of directly employing supervisors and contracting for other members of the security force favors a finding that a statutory relationship exists.
The third and last tier of the Berry, supra, statutory employment analysis requires a determination in accordance with the provisions of La.R.S. 23:1032 that the principal, LP & L, is engaged in the work at the time of the accident:
At this level “[i]t is irrelevant that the principal has the financial resources or expertise to enter into a particular trade, business or occupation. In order for any person to come within the scope of the statute he must be engaged in the enterprise at the time of the injury.” Lewis, supra. Id., 488 So.2d at 939.
A principal can be engaged in more than one business. Fonseca v. Marlin Marine *1121 Corp., 410 So.2d 674 (La.1981); Doss v. American Ventures, Inc., 261 La. 920, 261 So.2d 615 (1972). The burden is on the principal claiming statutory employer status to prove that the work being performed was part of the trade, business or occupation. Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503 (La.1973). The issue is decided on the facts of each case. Doss v. American Ventures, Inc., supra.
We have no doubt that under the facts in the record, LP & L was engaged in providing nuclear security force services at the time of Mouton’s accident. As operator of a nuclear power plant, LP & L is responsible to the U.S. Nuclear Regulatory Commission for maintaining safeguards.[6] In conformity therewith, LP & L confected a “Security Plan”. The trend in industry today is to supplement technical staffs with contract personnel.[7] The contract personnel work side-by-side with their counterparts who are direct employees of the owner.
A study of the contract also substantiates that LP & L was engaged in the enterprise of providing a security force at the time of the accident.
The Waterford III security force was composed of both LP & L and TWC employees. The highest ranking member of that force was the Owner’s Technical Representative or Security Supervisor, an LP & L employee. He was responsible for the overall supervision and direction of the security force and is responsible to the plant manager. LP & L directly employs 14 persons in security and security supervision. Under those supervisors is a sub-tier of supervision by TWC employees who supervise the security guards and watchper-sons. The security force operates daily around-the-clock, and had been in operation five years prior to Mouton’s injury, and was in operation at the time of the accident.
LP & L exercised control over TWC’s employment practices. TWC was to provide a designated hourly wage and incentives in order to minimize turnovers. LP & L also reserved the right to control promotions and merit pay increases.[8] Disciplinary action against TWC employees was to be approved by the LP & L Security Supervisor.[9] LP & L reserved the right to require the removal of any TWC employee.[10] LP & L paid TWC monthly for services, and invoices identified each TWC employee by name, rate of pay and time expended with respect to each service.[11] The TWC employees were obligated to comply with the written or verbal instructions of the LP & L Security Supervisor.[12]
LP & L reserved the right to review all prospective security personnel applications and pre-employment records and to approve or reject prospective TWC employees.[13] Each new employee was required to complete an on-the-job training program designed by LP & L, and LP & L reserved the right to approve and/or select training instructors.[14]
DECREE
Considering the facts of this case, and for the reasons assigned above, although not necessarily concurring with all of the reasoning of the trial judge, we do agree with his final conclusion that LP & L has successfully hurdled all three parts of the Berry inquiry establishing statutory employment.
We conclude that appellant, Ray James Mouton, was the statutory employee of LP & L at the time of his accident; that, under the law and jurisprudence that we have reviewed, his sole remedy is under the worker’s compensation statutes and that he *1122 cannot maintain this action in tort against appellee. There being no issues of material fact existing between appellant and ap-pellee, the judgment of the district court granting the motion of LP & L for summary judgment is correct and we affirm it.
Costs of this appeal are taxed against appellant.
AFFIRMED.

. La.R.S. 23:1061 (1985) provides in part:
Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work ... any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him....

. La.R.S. 23:1032 (1985) provides in part:
The rights and remedies herein granted to an employee or his dependent on account of injury, or compensable disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies ... against his employer, or any principal.... For purposes of this Section, the word "principal" shall be defined as any person who undertakes to execute any work which is a part of his trade, *1116 business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof.

. LP & L also filed a third party petition against TWC and its insurer, the Home Insurance Company, which subsequently intervened in this suit. None of the issues raised therein are before us on appeal, having been pretermitted by the trial court’s grant of summary judgment. The Home Insurance Company did not join in this appeal.

. 1976 La.Acts, No. 147 Section 1.

. 10 C.F.R. 73.55

. Id.

. American Consulting Corp. v. United States, 454 F.2d 473 (3 Cir.1971).

. Contract, Article 1.13

. Contract, Article 1.19

. Contract, Article 1.20(d), 1.27

. Contract, Article 1.33

. Contract, Article 2.1.1(c)

. Specifications, Article 2.10

. Specifications, Article 2.12.1