636 So.2d 1160 (1994)
James Ray RICHARD, et al, Plaintiffs-Appellants,
v.
Gerald TEAGUE, et al, Defendants-Appellees.
No. 92-17.
Court of Appeal of Louisiana, Third Circuit.
May 4, 1994.
Rehearing Denied June 20, 1994.
*1163 Robert C. McCall, for James Ray Richard, et al.
Alfred Veazie Pavy Boudreaux, for St. Landry Parish School Bd.
Andrew Anthony Lemeshewsky Jr., for Hartford Ins.
Edmond Hasse, for Comm'r of Ins.
Todd M. Ammons and Joe Hubbard, for LIGA.
Before GUIDRY, C.J., and DOUCET and COOKS, JJ.
GUIDRY, Chief Judge.
Plaintiff, James Richard, an employee of L & L Sandblasting of Eunice, Louisiana, was injured on August 27, 1987 while assisting in the unloading of football stadium bleachers at Eunice High School. The bleachers were purchased by the St. Landry Parish School Board from the Southern Bleacher Company *1164 of Texas. The bleachers were transported to Eunice High School on a flatbed tractor-trailer rig owned by N.L. Jones and leased to Triangle Trucking Company. Gerald Teague drove the truck from Texas to Eunice.
At the request of Eunice High School Principal Raymond Fontenot, L & L voluntarily provided a forklift and two employees, Richard and Richard Latiolais, to assist School Board personnel. After cutting the metal bands securing the bleacher risers to the trailer, Richard jumped off of the trailer and onto the ground. A bundle of risers, which had become unstable, fell on Richard. He suffered a fractured left leg, a compression fracture of the L3 vertebra, a concussion, and a six inch scalp laceration, along with numerous bruises. He eventually underwent a laminectomy and decompression fusion at L2-L4 in April of 1989.

PROCEDURAL BACKGROUND
Richard, his wife, Debra, and his two children, Kimberly and Johnathan, sued the School Board, its liability insurer, Pelican State Mutual Insurance Company (PSMIC), N.L. Jones, Triangle Trucking, and the truck driver, Teague. Hartford Accident and Indemnity Company (Hartford), L & L Sandblasting's worker's compensation insurer, intervened in the suit to recover weekly benefits and medical expenses paid to and on behalf of Richard. Prior to trial, on plaintiffs' motion, all defendants except the School Board and PSMIC were dismissed from the suit.
Pursuant to La.R.S. 13:5105, which prohibits suits against the State or a political subdivision from being tried to a jury, the trial was bifurcated. The jury determined liability and damages with respect to PSMIC while the judge determined liability and damages with respect to the School Board. Both triers of fact concluded that Richard was neither a statutory employee nor a borrowed servant of the School Board. The opposite result would have bestowed tort immunity upon the School Board. Additionally, both determined that the School Board and Richard were at fault in causing the accident and resulting injuries. They apportioned fault and awarded damages as follows:

a) Apportionment of fault Jury Judge
 1) School Board 65.5% 80%
 2) Plaintiff 34.5% 20%
b) Damages
 1) James Richard:
 a) Physical and mental pain and anguish,
 past and future, and any permanent disability $ 30,000.00 $ 75,000.00
 b) Medical Expenses:
 (i) Past 63,000.00 62,304.14
 (ii) Future 12,000.00 15,000.00
 c) Past loss of earnings 20,000.00 30,000.00
 d) Future loss of earnings capacity 50,000.00 70,000.00
 e) Loss of enjoyment of life 1,000.00 35,000.00
 2) Debra Richard (loss of consortium) 750.00 15,000.00
 3) Kimberly Richard (loss of consortium) 750.00 5,000.00
 4) Johnathan Richard (loss of consortium) 750.00 2,000.00
 ___________ ___________
 TOTAL DAMAGES $178,250.00 $309,304.14

The trial judge signed a judgment incorporating both verdicts. The court did not decree the status of Hartford's intervention rights. Thereafter, defendants, PSMIC and the School Board, suspensively appealed. The plaintiffs and Hartford appealed devolutively.
Defendants contend the trial court erred in the following particulars:

*1165 1. Finding that plaintiff was not the statutory employee of the St. Landry Parish School Board.
2. Referring to the activity taking place as "unloading of bleachers" as the work being performed by the School Board was much broader than merely unloading the bleachers and should have been referred to in a more appropriate general term.
3. Finding that plaintiff was not a borrowed servant of the St. Landry Parish School Board.
4. Failing to amend the jury verdict to include specific findings on the issue of borrowed servant, resulting in confusion of the jury.
5. Finding that plaintiff was not an independent contractor of St. Landry Parish School Board to whom no duty is owed.
6. Denying defendants' motion for a directed verdict on the independent contractor issue.
7. Failing to admit into evidence the records of plaintiff's previous criminal activity for impeachment purposes.
8. Allowing a separate award for loss of enjoyment of life without specifically defining for the jury this element of damages and that it should not be duplicated in general damages.
9. Allowing reference to subsequent remedial measures taken after the accident to unload the truck.
10. Awarding damages to Johnathan Richard which were not proven by a preponderance of the evidence.
11. Allowing testimony concerning the total amount of medicals incurred by the plaintiff as all medical expenses incurred were not related to this accident.
12. Allowing unsubstantiated testimony concerning money received by plaintiff for cutting grass and yard work. A motion to strike was denied on this issue which was also error.
Plaintiffs assign three errors to the trial court's judgment, to-wit:
1. Allowing the jury to apportion the fault of the School Board.
2. Awarding inadequate amounts of general damages.
3. Alternatively, the trial judge's apportionment of fault and award of damages are more reasonable than that of the jury.
On July 9, 1992, PSMIC was placed in conservation under the direction and control of the Insurance Commissioner by order of the Nineteenth Judicial District Court. On motion of the School Board and PSMIC, this court stayed all appellate proceedings on September 30, 1992. On February 26, 1993, the Nineteenth Judicial District Court ordered the liquidation of PSMIC and stayed all proceedings against PSMIC for 90 days. The stay was later extended an additional 60 days. On October 8, 1993, plaintiffs filed a motion to substitute parties, to lift the stay order, and to require defendants to post a new appeal bond. In response, this court lifted the September 30, 1992 stay order and substituted the Louisiana Insurance Guaranty Association (LIGA) for PSMIC in these proceedings.
Thereafter, LIGA filed a brief with this court in which it adopted PSMIC's assignments of error and asserted the following statutory defenses:
1. LIGA's entitlement to a credit pursuant to La.R.S. 22:1386(A) for medical benefits and compensation payments made to Richard by Hartford.
2. LIGA and the School Board are not obligated to pay the subrogation claim of Hartford pursuant to La.R.S. 22:1379(3)(b).
3. Pursuant to La.R.S. 22:1382(A), LIGA's per claim liability is $150,000, subject to a $100 deductible.
4. Retroactively applying Act 958 of 1993, LIGA cannot be held responsible for court costs.
5. Pursuant to La.R.S. 22:1379(3)(d), LIGA is not responsible for payment of any pre-insolvency accrued interest.
6. If LIGA is cast in judgment for the maximum allowed liability of $150,000, it is not responsible for legal interest accruing thereon. La.R.S. 22:1382(A)(1)(b).
We shall address these issues raised by LIGA after we address the assignments of error.

*1166 FACTUAL BACKGROUND

The bleachers and bleacher risers were purchased for the School Board by James Prados, the supervisor of athletics and physical education. He had no prior notice that the bleachers were arriving on August 27, 1987 until he arrived for work at the School Board office that morning. When told of the arrival of the bleachers, Eli Cortez, the School Board's maintenance foreman, contacted three employees working in the Eunice area and instructed them to unload the truck. Herbert Prudhomme, a paint foreman, Ignace Cummings, a carpenter, and Floyd Trahan, a maintenance man, reported to the site. Harold Arceneaux, another maintenance man, was also present. When the School Board personnel realized that the equipment could not be unloaded manually, Prudhomme called Cortez who, according to Prudhomme, told him to try to locate a forklift in the Eunice area. In testimony, Cortez could not recall speaking to Prudhomme.
Principal Fontenot then contacted Richard Latiolais with L & L Sandblasting and asked for their help and a forklift to unload the bleachers. After getting approval from his boss, Richard LeDoux, Latiolais and Richard departed for the school with an 18,000 pound capacity Hyster forklift owned by L & L Sandblasting. Fontenot testified that L & L agreed to "volunteer" their manpower and forklift to help the school and that no formal agreement was entered into.
When they arrived at the school, the L & L employees helped School Board personnel unload small items by hand from the rear of the trailer. Thereafter, with Latiolais operating the forklift, they began to unload the risers from the front of the trailer. According to Latiolais, the risers were bound five to six in a group and weighed approximately 500 lbs. Although Richard stated that he could not recall cutting the bands which secured the risers to the trailer, Prudhomme and Arceneaux testified that they witnessed Richard unfasten the bands. Latiolais then off-loaded one set of risers with the forklift and drove to the other side of the trailer and toward the stadium. Richard then jumped from the trailer to the ground and stood by facing the rear of the trailer. A bundle of risers, which Richard had unfastened, then fell from the trailer on Richard. The workers rushed to his aid and lifted the bundle of risers off of Richard. According to Prudhomme, he was conscious for a few seconds then passed out for about five minutes. He was bleeding from the side of his head.
He was brought to Moosa Memorial Hospital in Eunice where he was examined by Dr. Rodney Landreneau, Jr., a general surgeon. Dr. Landreneau diagnosed an open, comminuted fracture of the upper middle one-third of the left tibia and fibula, a cerebral concussion and lacerated scalp, a compression fracture of the L3 vertebra, and chest contusions. There were no neurological deficits and no indications of paralysis. Richard exhibited no sciatica, radiating pain from the lower back to the leg. Dr. Landreneau consulted Dr. Frank Anders, an orthopaedic surgeon, who performed a "reduction" of the fracture and placed the leg in proper alignment. Richard was also prescribed a chair-type back brace.
Richard was thereafter followed medically by Dr. Landreneau and Dr. Douglas McKay, an orthopaedic surgeon. According to Dr. Landreneau, his recuperation progressed well until November of 1987, when he began to show early signs of nerve root compression in the lower back. In December, Richard began to develop muscle spasms in his lower back. A December 11, 1987 myelogram, performed at Savoy Medical Center in Mamou, revealed a moderate compression of the subarachnoid space by a bone fragment identified posteriorly at L3.
Throughout 1988, Dr. Landreneau encouraged Richard to exercise and walk two to four miles per day. On April 27, 1988, Dr. Landreneau noted that Richard appeared to be depressed and worried about returning to work. On September 30, 1988, he detected left sided sciatic pain. On December 12, 1988 and January 3, 1989, Richard complained of "severe" back pain and appeared depressed and concerned about the possibility of surgery.
Dr. McKay allowed Richard to bear weight on his leg in early November 1987. The cast was removed on January 19, 1988, and Richard *1167 began physical therapy. In February 1988, he exhibited a positive straight leg raising test suggestive of a disc problem. Richard continued to complain of back pain and exhibited a depressed mood throughout 1988.
Dr. McKay referred Richard to Dr. Robert Rivet, a neurosurgeon. Dr. Rivet referred him to Dr. Louis Blanda, who examined Richard for the first time on February 6, 1989. Richard exhibited a positive straight leg raising test which indicated nerve involvement. A magnetic resonance imaging (MRI) scan and a CT scan revealed an L3 compression fracture with retropulse fragmentation impinging on nerve structures. An electromyogram (EMG), however, found no objective neurological deficit. On March 30, 1989, Dr. Blanda recommended a spinal fusion. The surgery was performed on April 25, 1989 by Drs. Rivet and Blanda. Dr. Rivet decompressed the spinal canal and Dr. Blanda performed the fusion between L2 and L4 using a bone graft. Richard was discharged from the hospital on May 2, 1989. Four months after the surgery, Richard was progressing well, had no pain and his reflexes were normal. Dr. Blanda followed his progress through the remainder of the year and into 1990.
Dr. Blanda referred Richard to the Center for Work Rehabilitation for a work capacity evaluation, which took place on November 13, 1990. He was put through a battery of various work-related physical tests during the three hour, fifteen minute evaluation. Catherine Palmer, the occupational therapist supervising the evaluation recommended that Richard be limited to light duty work. Dr. Blanda concurred in this conclusion and stated further that, with proper conditioning, Richard could probably perform medium duty work. He recommended that Richard undergo a work hardening program to increase his capabilities.
Throughout his physical recovery, Richard was also evaluated for psychological problems he was experiencing. He was examined by Dr. William Cloyd, a psychiatrist, on June 23, 1988. Dr. Cloyd diagnosed an adjustment disorder with associated depression and anxiety. He stated that a more exact diagnosis would be a dysthymic disorder, a moderate, intense depression. Dr. Cloyd recommended two to three years of treatment at a cost of between $12,000 and $15,000. Dr. Ted Friedberg, a clinical psychologist, examined Richard on July 11, 1988. He diagnosed a depression reaction to the physical difficulties and recommended support counseling and anti-depressant medication.
Dr. Richard Pollock, a neuropsychologist, put Richard through a day-long battery of neuropsychological tests on October 20, 1989. He diagnosed organic brain syndrome and post-concussive dysthymia (an anxiety disorder) and depression. Dr. Pollock recommended a nine-month intensive rehabilitation program, Project Re-Entry, at a cost of $1,200 per week for the first six months and $600 per week for the remaining job placement phase. It was his opinion that Richard could be rehabilitated to being able to work even given his borderline intellectual skills.
Dr. Howard Marmel, a neurologist, examined plaintiff on February 25, 1991, within a month before trial. He diagnosed organic brain syndrome and an anxiety disorder as a result of the head injury. He recommended that Richard undergo psychological treatment and cognitive rehabilitation.
As of the date of trial, plaintiff had not returned to any form of work nor had he tried to secure employment. Jeffery Peterson, a vocational rehabilitation specialist, administered the Wide Range Achievement Test to Richard. According to the results, Richard's reading and spelling ability were below the third grade level and his math skills were at the beginning third grade level. Richard's I.Q. was measured at 76. Without vocational rehabilitation services, Peterson opined that it would be difficult for Richard to find work in the Eunice area. With the services, Peterson stated that, even though the potential for employment was limited, Richard could be a janitor or a warehouseman if he could physically withstand the job for eight hours per day. Allen Simmons, defendant's vocational rehabilitation specialist, ran off a litany of light duty jobs which he concluded Richard was capable of performing. All of the jobs listed by Simmons *1168 fell into the $4.25 to $5.50 per hour pay range.

STANDARD OF REVIEW
In a bifurcated trial where the jury and judge reach conflicting findings of fact and there is an appeal, the court of appeal must resolve these differences and render a single harmonized decision based on the record as a whole. In such a situation, the manifest error rule is inapplicable, and the court of appeal must decide which decision is more reasonable after a careful examination of the record. Morales v. Tetra Technologies, Inc., 608 So.2d 282 (La.App. 3rd Cir. 1992), writ denied, 610 So.2d 818 (La.1993); American Casualty Co. v. Illinois Central Gulf Railroad Co., 601 So.2d 712 (La.App. 5th Cir.1992), writ denied, 604 So.2d 1005 (La.1992); Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3rd Cir.1987), writs denied, 522 So.2d 562, 563 (La.1988). Where there is no conflict in particular findings of the judge and jury in a bifurcated trial, these findings of fact are reviewable under the manifest error-clearly wrong standard. Felice, supra, at 924.

EVIDENTIARY ISSUES
Defendants assert the trial court erred in three separate respects with regard to the admissibility of evidence concerning Richard's prior criminal activity, a prior inconsistent statement, and subsequent remedial measures undertaken by the School Board.
Prior Criminal Activity. The School Board and PSMIC sought to introduce evidence of Richard's prior arrests and convictions during cross-examination. On direct examination, Richard admitted to convictions for burglary, car theft, and aggravated escape for which he served 14 months in the St. Landry Parish Jail in the early 1970s. He denied any other criminal activity. On cross, defense counsel questioned him concerning subsequent convictions and arrests. Plaintiffs' counsel objected and later rehabilitated his client, who stated that he had not been charged with a felony since 1977. The trial judge did not allow defendants to proceed further on this issue because he did not want to "try things that occurred 15, 20 years ago".
On appeal, defendants contend that, because plaintiff put his prior criminal record at issue on direct, they should have been allowed to fully explore that record and impeach him on his denial of any more criminal activity than the three offenses admitted on direct. We disagree. Pursuant to La.C.E. art. 609(B), if more than 10 years have elapsed since the date of a conviction, evidence thereof is not admissible in a civil case. Additionally, evidence of arrest, indictment, or prosecution of a witness is not admissible for the purpose of attacking his credibility. La.C.E. art. 609(F). A review of the criminal records proffered by defendants indicates no conviction within the 10 year period prior to trial. Accordingly, the trial judge did not err in ruling this evidence inadmissible.
Prior Inconsistent Statement. Defendant sought to introduce a statement made by Richard on February 23, 1988 to Mason Perrault, an insurance adjuster. The purpose stated was to impeach his credibility on the issue of whether he cut the bands securing the bleacher risers. In the statement proffered by defendants, Richard stated that he cut the bands. In his deposition, he stated that the truck driver cut the bands. At trial, under cross, he initially stated that he could not recall who cut the bands. Defense counsel tried to question him concerning the contents of the prior statement. In response and in reference to the prior statement, Richard stated "I must have cut them (the bands)". Plaintiffs' counsel objected to the admission into evidence of the prior statement. The court ruled it inadmissible.
Pursuant to La.C.E. 607(D)(2), prior inconsistent statements are admissible to attack a witness' credibility unless the probative value of the credibility issue is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. The trial judge did not state a reason for his ruling. The statement was, in our opinion, clearly admissible to attack Richard's credibility. The court's ruling was thus erroneous. However, we conclude that this error was harmless since defense counsel was allowed to refer to the statement and *1169 Richard even contradicted his prior trial testimony to conform to the substance of the statement. In effect, defendants were allowed to attack his credibility in front of the judge and the jury by using the statement against him. Their goal was attained despite the judge's ruling on the inadmissibility of the statement.
Subsequent Remedial Measures. Defendants objected to plaintiffs' counsel's questioning of Richard Dronet, the School Board's maintenance supervisor, on the issue of how the truckload of bleachers was eventually unloaded. The trial court overruled the objection. Dronet then stated that the bleachers were transported to the School Board office in Opelousas. The bleachers were unloaded the next day by the School Board's dragline or a backhoe and chain. Dronet was present at the office and witnessed some of the unloading.
La.C.E. art. 407 provides:
In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility.
The prohibition against subsequent remedial measures evidence is designed to bring within the scope of the rule any change, repair or precaution subsequent to an accident. Northern Assurance Co. v. Louisiana Power and Light Co., 580 So2d 351 (La.1991). In this case, Dronet testified concerning the change in location and the change in equipment used to unload the bleachers. He mentioned nothing concerning any further precautions or changes in School Board personnel supervising the unloading. Given that it is undisputed that the L & L forklift in no way caused the bleacher risers to fall on Richard, the mention by Dronet of the use of a dragline or a backhoe to unload the bleachers does not amount to a subsequent remedial or precautionary measure tending to prove negligence or culpable conduct. Accordingly, the trial court did not err in allowing Dronet to testify on this issue.

STATUTORY EMPLOYER
Defendants assert that the trial court erred in failing to conclude that Richard was the School Board's statutory employee pursuant to La.R.S. 23:1061. Both the judge and jury concluded that the School Board was not Richard's statutory employer. Although the judge and jury arrived at their respective conclusions through different analyses, the results, which are the same, are subject to the manifest error standard of review. Defendants also cite error in the trial court's characterization of the work as "unloading bleachers". They argue that the process which Richard took part in was greater in scope, entailing unloading, setting up and constructing the bleachers.
Under La.R.S. 23:1061, employees of contractors are, under certain circumstances, considered employees of the principal. If so, the principal is immune from tort liability. When this accident occurred in 1987, the question of statutory employment was resolved according to the Louisiana Supreme Court's analysis in Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986). The court enunciated a three tiered analysis by which the existence of a statutory employment relationship can be determined. By Act 454 of 1989, the legislature amended La.R.S. 23:1061(A) and overruled the Berry analysis effective January 1, 1990. Because, under Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992), the governing law in a compensation action is that which was in effect at the time of the alleged injury, we are compelled to apply the Berry analysis to the facts of this case.
The tri-level analysis of Berry, supra, at 937-939, is as follows:
"In the first level, the primary focus is on the scope of the contract work. `The specific task to which an individual employee is put should not be determinative of his coverage under the Act. Instead, the entire scope of the work contract must be *1170 considered.' Lewis, supra, citing Malone, Principal's Liability for Workmen's Compensation to Employees of Contractors, 10 La.L.Rev. 25 (1949). The central question to be answered is whether the contract work is specialized or non-specialized. This of course is a question of fact, and courts should consider whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. If it is determined that the contract work is specialized per se, as a matter of law the work is not a part of the principal's trade, business or occupation, and the principal is not the statutory employer of the specialized contractor's employees. In this situation, `the purpose behind the rule is not violated and the reason for holding the principal directly liable in compensation exclusively does not come into play' because the contractor is an independent business enterprise, rather than a mere intermediary interposed to avoid compensation responsibility. Williams v. Shell Oil Co., 677 F.2d 506 (5th Cir.1982) (Tate, J. writing for the panel), citing 13 W. Malone & H. Johnson, La.Civil Law TreatiseWorker's Compensation, §§ 78, 126 (1980).
If it is determined that the contract work is non-specialty, then the inquiry shifts to a comparison of the principal's trade, business or occupation and the contract work to see if the latter can be considered a part of the principal's trade, business or occupation. The jurisprudence has forged several guidelines, in no way exhaustive, which can aid a court in resolving this factual issue:
(1) Is the contract work routine and customary? That is, is it regular and predictable? Nonrecurring or extraordinary constructions and repairs usually are outside the scope of the statute. On the other hand, general maintenance and repair work, which by their very nature allow the smooth and continued operation of the principal, are within the scope of coverage. Lewis, supra; Benson [v. Seagraves, 436 So.2d 525 (La.1983)], supra; Barnes, [v. Sun Oil Co., 362 So.2d 761 (La.1978)], supra; Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503 (La.1973).
(2) Does the principal have the equipment and/or manpower capable of performing the contract work? This is a sub-species of the specialty inquiry, supra. Here the primary focus is on determining whether the contract work as relates to the principal is handled ordinarily through employees. Lewis, supra, citing 1C. A. Larson, The Law of Workmen's Compensation, § 49.12, at 9-41 (1982).
(3) What is the practice in the industry relative to the contract work? Do industry participants normally contract out this type of work or do they have their own employees perform the work? See Reeves, supra; Brown v. Kaiser Aluminum and Chemical Corp., 289 So.2d 524 (La.App. 1st Cir.1973), writ not considered 293 So.2d 171 (La.1974); Malone & Johnson, supra, § 126, pp. 252-53, fn. 91.
These guidelines are not absolute or rigid, but are instead to be applied relatively, taking into consideration the size, complexity, integration (either horizontal or vertical), or the lack thereof, etc. of the principal. What may be nonrecurring to a small concern, may for an industry giant be regular. Similarly while the type of contract work may be non-specialized (i.e. manual labor), for a small concern it may well be beyond the expertise or capability of its employees. 1 A. Larson, Workmen's Compensation for Occupational Injuries and Death, § 49.13 (Desk ed. 1985). Basically, the factors developed by the jurisprudence strive to answer the overriding question of `whether [the contract work] is, in that business, normally carried on through employees rather than independent contractors.' Id. (emphasis added)
Lastly, the court must determine if the principal is engaged in the work at the time of the alleged accident. La.R.S. 23:1032. At this level `[i]t is irrelevant that the principal has the financial resources or expertise to enter into a particular trade, business or occupation. In order for any person to come within the scope of the *1171 statute, he must be engaged in the enterprise at the time of the injury.' Lewis, supra."
The judge determined that the scope of work contracted was "unloading bleachers" and characterized the work as such in jury interrogatories. Defendants claim the scope was much broader and entailed the general process of purchasing, unloading, and erecting bleachers. Our review of the record convinces us that the trial judge did not err in this respect. Richard Latiolais testified that Principal Fontenot asked him if L & L Sandblasting "could give the school a hand" by helping to "unload bleachers". He and Richard were sent by their boss, LeDoux, to perform this task. Principal Fontenot likewise stated that he called L & L Sandblasting to inquire as to whether they would help unload the equipment. The record contains no indication that Latiolais, Richard, and the forklift were sent to the school to purchase, erect, or do anything else other than unload the bleachers. The trial judge correctly characterized the scope of the contract work.
On the issue of specialization, the jury concluded that the unloading of bleachers was specialized per se. The judge reached the opposite conclusion. At this point, the jury's inquiry ended because, as a matter of law, the principal (School Board) is not the statutory employer of the specialized contractor's employee. Under the facts of this case, the judge's conclusion of non-specialization is more reasonable. The work of unloading bleachers from a trailer does not require a degree of skill, training, experience, education and/or equipment not normally possessed by those outside of the contract field. The judge then concluded that unloading bleachers was not part of the School Board's trade, business, or occupation. He did not, however, give reasons for his determination.
Applying Berry, we conclude that the judge's determination was not clearly wrong. Unloading bleachers, from the School Board's perspective, is not "routine and customary". This is a nonrecurring work action that occurs only when a School Board purchases new bleachers. This determination is also buttressed by the fact that School Board administrators originally thought that the work could be accomplished with manpower alone. While the School Board had the equipment (a dragline) and personnel capable of unloading the bleachers, it is clear from the record that the dragline was in Opelousas at the time and would have taken the entire day to arrive in Eunice. Thus, practically speaking, it would not have been possible for the school Board to do the work on the date of Richard's injury. Additionally, no evidence was presented relative to "industry practice" amongst School boards for this type of work. On balance, our consideration of these factors militates in favor of the trial judge's conclusion that "unloading bleachers" was not a part of the School Board's trade, business, or occupation.
In sum, we find no error in the trial judge's determinations of status vis-a-vis the School Board, L & L Sandblasting and Richard. We adopt his results under the Berry analysis and affirm his finding that Richard was not the School Board's statutory employee.

BORROWED EMPLOYEE
Both the judge and jury concluded that Richard was not the School Board's borrowed employee. Defendants contend that this result was erroneous and that the judge's instruction to the jury on this issue led to confusion of the jury. This factual determination is subject to the clear error standard of review.
The court instructed the jury to apply ten factors cited in Brumbaugh v. Marathon Oil Co., 507 So.2d 872 (La.App. 5th Cir.1987), writ denied, 508 So.2d 824 (La. 1987), to determine whether Richard was a borrowed servant. These factors are:
(1) first and foremost, right of control;
(2) selection of employees;
(3) payment of wages;
(4) power of dismissal;
(5) relinquishment of control by the general employer;
(6) which employer's work was being performed at the time in question;

*1172 (7) an agreement between "borrowing" and "lending" employers;
(8) furnishing the necessary instruments and place for performance of the work;
(9) length of time in employment; and,
(10) acquiescence by the employee in the new work situation.
Brumbaugh, supra, at 875.
Defendants argue that, because the jury, during deliberations, asked the judge to repeat these factors to them, they were confused by the use of these factors in the instructions. We disagree. The fact that a jury seeks clarification of a charge from the judge does not necessarily mean that they are confused. There is no indication in the record of a reason for the jury's seeking this clarification. In any event, the ten factors, which are expressed in plain and simple English, are not so difficult to understand such that confusion of the jury would result. Viewing these factors in light of the jury charge as a whole, it is clear that the trial court did not err in charging the jury on these factors.
We likewise conclude that neither the judge nor the jury were clearly wrong in their application of these factors. It is clear from the record that L & L Sandblasting had the right to control, pay, and dismiss Richard. Additionally, L & L Sandblasting selected Richard and Latiolais to perform the work. Herbert Prudhomme, the School Board's senior man at the site, stated that no one was really in charge of the unloading operation. Harold Arceneaux, another School Board employee, stated that no one from the School Board told Latiolais how to run the forklift. In essence, this situation involved short-term volunteer work on the part of L & L Sandblasting. Under Brumbaugh, supra, in order for Richard to become the School Board's borrowed employee, it must be shown that his employer-employee relationship with L & L Sandblasting was suspended and that a new and like relationship was created between Richard and the School Board. The School Board failed to carry this burden of proof. Accordingly, under the particular facts of this case, the judge's and jury's determinations were not clearly wrong.

INDEPENDENT CONTRACTOR
Defendants contend that the trial judge erred in failing to find that L & L Sandblasting was an independent contractor of the School Board and in refusing to direct a verdict on this issue. Apparently, in the alternative, defendants argue that because L & L Sandblasting controlled the unloading process and Richard, L & L's employee, created the hazard, the defendant should not be held responsible for the negligent acts of its independent contractor or its employee. Plaintiffs counter that the agreement, if any, between the School Board and L & L Sandblasting did not establish a principal-independent contractor relationship.
Whether a person's or entity's status is that of an independent contractor, in which case there is no vicarious liability, or that of a mere servant, in which case the employer is vicariously liable for the torts of his employee, depends in great measure upon whether and to what degree the right to control the work has been contractually reserved by the principal. The supervision and control actually exercised by the principal is less significant. Hemphill v. State Farm Insurance Co., 472 So.2d 320 (La.App. 3rd Cir.1985). In order to establish an independent contractor relationship, the following requisites are necessary: a contract between the parties; the independent nature of the contractor's business; the nonexclusive means the contractor may employ in performing the work; a specific, agreed upon price; a specific time duration for the undertaking; and, an agreement that the undertaking is not subject to termination or discontinuance at the will of either side without liability for its breach. Hemphill, supra, at 322, citing Odom v. Eaves, 311 So.2d 575 (La.App. 3rd Cir.1975).
Clearly, the "contract" agreed upon under the facts of this case does not establish a principal-independent contractor relationship. The agreement was confected between Principal Fontenot and Latiolais with L & L Sandblasting after Latiolais received the consent of his boss, LeDoux. It was gratuitous and contained no agreement concerning the *1173 right of control. Because we find that, on the merits, no principal-independent contractor relationship existed, we need not address the propriety of the trial judge's denial of defendants' motion for directed verdict on this issue.

APPORTIONMENT OF FAULT
Defendants assert that both the judge and jury erred in finding the School Board at fault in causing this accident. They argue that Richard was 100% at fault because of his unsafe acts and that the School Board acted reasonably when faced with a last minute decision on how to unload the truck. Plaintiffs argue that Richard was guilty of no fault and that, in the alternative, the judge's apportionment of fault was more reasonable.
Michael Frenzel, plaintiffs' safety expert, testified that the root cause of the accident was a failure in the School Board's management system that permitted the unsafe condition to exist. He stated that the management system failed to provide adequate supervision and to anticipate and detect the potential for unsafe acts or conditions. He also conceded that a hazardous condition was created when the bands securing the bleacher risers were cut.
Jack Barnidge, defendants' safety expert concluded that the accident was caused solely by plaintiff in cutting all of the bands, not remaining on the trailer, putting himself in a dangerous position, and not directing his attention to the unsecured and unstable load. Barnidge stated further that the School Board was not deficient in managing or instructing its workers in the unloading process. The key factor, according to Barnidge, was that Richard's behavior created an unsafe condition that resulted in his injury.
Neither the judge nor the jury erred in finding that both the School Board and Richard were at fault in causing this accident. The School Board was remiss in not having a clear plan for the unloading process and in not having someone designated as being in charge of and directing the operation. Richard was also at fault in that he created the unsafe condition upon the trailer that led to his injury.
We must now turn to a consideration of which apportionment of fault, the judge's or the jury's, was more reasonable. We do so in light of Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985), wherein the court stated as follows:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Considering these factors with reference to the record as a whole, we conclude that the judge's apportionment of fault was more reasonable. Accordingly, we affirm his finding that the School Board was 80% at fault and Richard was 20% at fault.

DAMAGES
Defendants contest the following awards: loss of earnings capacity, general damages, loss of enjoyment of life, and Johnathan Richard's loss of consortium. Plaintiffs seek an increase in the award of general damages.
Loss of Earnings Capacity. The jury awarded Richard $50,000. The judge awarded him $70,000. Plaintiffs' expert economist, Donald Cornwell, testified that the present value of Richard's lost earnings capacity could vary depending on the number of prior years used as a basis and other variables such as his ability to return to work. He cited a minimum present value amount of $99,202.98 and a maximum present value amount of $135,919.88. He based the low value on the income stream of the four years preceding the accident and the high *1174 figure on the ten years preceding the accident.
Dennis Boudreaux, defendants' economics expert, gave a minimum present value figure of $53,440 (using a 5% discount rate) and a maximum present value amount of $63,058 (using a 3% discount rate). These figures were based on the six year average income preceding the accident and were derived on the assumption that Richard would never work again.
Furthermore, defendants contend that this award was, in part, based upon undocumented information concerning Richard's income from grass cutting. He stated that he earned $3,439.50 in 1986 and $4,775.10 in 1987 and provided a handwritten list of the sources of his income. This income was not reported on his tax returns. It is well settled that plaintiff's uncorroborated testimony is sufficient to prove lost wages as long as such proof is uncontradicted and reasonably establishes his claim. Green v. Superior Oil Co., 441 So.2d 54 (La.App. 3rd Cir.1983). Viewing the record as a whole, we conclude that the judge's award of $70,000 was more reasonable. This award is affirmed.
General Damages/Loss of Enjoyment of Life. The judge awarded $75,000 for "pain and suffering" and $35,000 for loss of enjoyment of life. The jury awarded $30,000 for "pain and suffering" and $1,000 for loss of enjoyment of life.
Defendants claim the $30,000 jury award was proper and that the award for loss of enjoyment of life was duplicative in part of general damages. Plaintiffs seek an increase to the $300,000 to $400,000 range. Alternatively, they argue the judge's award is more reasonable.
On the last day of trial, plaintiffs were allowed to amend and supplement their petition to add, within general damages, a claim for loss of enjoyment of life. They did not increase the general damages amount demanded. Apparently, the trial judge allowed the amended and supplemental petition to be filed to conform to the evidence presented at trial. See La.C.C.P. arts. 1154, 1155. Clearly, loss of enjoyment of life may be included within the category of general damages. However, it is not, of necessity, duplicative of "physical and mental pain and anguish, past and future, and any permanent disability". Given the testimony by Richard, his family, and the psychological and vocational experts, it is clear from the record that Richard established evidence sufficient to warrant the listing of "loss of enjoyment of life" as a separate element of damages. In reviewing an award of general damages, a court of appeal is required to focus on the total award and not on each individual item. Andrews v. Mosely Well Service, 514 So.2d 491 (La.App. 3rd Cir.1987), writ denied, 515 So2d 807 (La.1987).
Richard suffered several serious injuries, one of which, his lower back, grew progressively worse as time passed. It did not resolve itself until nearly four months after his April 1989 surgery. This accident also caused Richard to suffer depression and anxiety. Viewing the record as a whole, we conclude that the judge's award of $110,000 is more reasonable than that of the jury.
In so ruling, we implicitly also find that the judge did not abuse his discretion in making this award. We therefore reject plaintiffs' claim for an increase in this award.
Johnathan's Loss of Consortium. The jury awarded $750 and the judge awarded $2,000 to Johnathan for his loss of consortium. Defendants contend that, because the awardee did not testify, proof of this element of damages was not sufficient. Plaintiffs argue that the testimony of Johnathan's parents was sufficient to establish his right to recover.
Richard and his wife Debra did provide testimony concerning the change in Richard's relationship with Johnathan. The gist of this testimony was that the relationship has become more contentious and that Richard cannot play sports with his son as before. Given this tenuous evidence, we conclude that the jury's $750 award is more reasonable.
Remainder of Award. We conclude that, in consideration of the remaining amounts awarded, the judge's awards were more reasonable than the jury's. We therefore affirm *1175 his awards for past medical expenses, future medical expenses, past and future lost earnings, and the loss of consortium awards to Debra and Kimberly Richard.

LIGA'S DEFENSES
Credit. LIGA first claims that it is entitled to a credit for that portion of Richard's damages already paid by intervenor, Hartford, i.e., medical expenses and weekly compensation benefits. The parties stipulated that Hartford paid $62,304.14 in medical expenses and $19,729.91 in weekly benefits.[1]
LIGA's argument rests upon La.R.S. 22:1386, which provides, in pertinent part:
A. Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer which is also a covered claim, shall be required first to exhaust his rights under such policy. Such other policies of insurance shall include but shall not be limited to liability coverage, uninsured or underinsured motorist liability coverage, or both, hospitalization, and other medical expense coverage. As to the association, any amount payable by such other insurance shall act as a credit against the damages of the claimant, and the association shall not be liable for such portion of the damages of the claimant. (Emphasis ours)
In Senac v. Sandefer, 418 So.2d 543 (La. 1982), plaintiff sought execution of a general damages award against LIGA, which, in defense, claimed a credit for worker's compensation benefits and medical expenses paid by plaintiff's compensation insurer. The court held that, because the judgment did not include lost wages or medical benefits, LIGA was not entitled to offset general damages against compensation benefits. In the present case, the judgment provides for lost wages and medical benefits.
The above-cited statute was amended to its present language by Act 130 of 1990 which became effective on September 7, 1990. By Act 237, § 3 of 1992, the legislature provided that "[t]his act shall apply to all covered claims, as defined in La.R.S. 22:1379, pending on or arising on or after the effective date of this act". The act was effective June 10, 1992.
Recently in Segura v. Frank, 93-1271 (La. 1/14/94); 630 So.2d 714, the court concluded that "a claim is pending as long as it is subject to judicial scrutiny ... a claim `pending appeal', as that phrase is commonly understood in a legal context, is a pending claim". The court thereafter applied the 1992 amendment to La.R.S. 22:1386(A) retroactively to grant LIGA's claim that, by operation of this statute, the uninsured motorist carriers became primarily liable for plaintiff's loss.
For similar reasons as those expressed in Segura v. Frank and Senac v. Sandefer, we hold that LIGA is entitled to a $62,304.14 credit against past medical expenses and a $19,729.91 credit against past lost wages.
Liability to Hartford. LIGA next claims that, pursuant to La.R.S. 22:1379(3)(b), LIGA and the School Board are not liable to pay Hartford's subrogation claim should it be recognized. Hartford's subrogation claim was not considered and disposed of by the trial court and is not before us on this appeal. Additionally, the appeal of Hartford was dismissed by order of this court dated January 25, 1994.
Liability Limit. LIGA asserts its per covered claim limit of liability is $150,000 subject to a $100 deductible. La.R.S. 22:1382(A)(1)(a)(iii). We recognize this liability limit as controlling. The resulting judgment shall reflect this limitation.
Court Costs and Legal Interest. LIGA contends that it is exempt from being cast in judgment to pay court costs and legal interest. Concerning the costs issue, LIGA relies upon La.R.S. 13:4521(A), which exempts LIGA from the payment of advance court costs. The statute provides:
Except as provided in R.S. 13:5112, R.S. 19:15 and 116, and R.S. 48:451.3, and as hereinafter provided, neither the state, nor any parish, municipality, nor other political subdivision, public board, or commission, nor any officer or employee of any such *1176 governmental entity when acting within the scope and authority of such employment or when discharging his official duties shall be required to pay court costs in any judicial proceeding instituted or prosecuted by or against the state, or any such parish, municipality, or other political subdivision, board, or commission, in any court of this state or any municipality of this state, including particularly but not exclusively those courts in the parish of Orleans and the city of New Orleans. This Section shall also apply to the Louisiana Insurance Guaranty Association and the Louisiana Life and Health Insurance Guaranty Association in any judicial proceeding instituted by or against them. This Section shall also apply to employees or agents of the state if they are named as defendants in a suit arising out of the course and scope of their employment or agency. Costs which are temporarily deferred pursuant to this Section cannot be shifted to opposing parties during the pendency of such deferment. (Emphasis ours)
This section was amended by Act 958 of 1993, effective June 25, 1993, so as to make same applicable to the Louisiana Insurance Guaranty Association. We need not consider whether the amendment should be applied retroactively as the exemption allowed by this section is simply a deferment of the liability for costs, which following rendition of judgment, may be assessed in favor of the successful party and against the governmental agency pursuant to La.R.S. 13:5112 provided the dollar amount of costs assessed is expressly set forth in the judgment of the trial court or the decree of the appellate court. La.R.S. 13:4521(A) does not therefore operate as an absolute bar to the assessment of costs against LIGA.
LIGA also asserts that La.R.S. 22:1379(3)(d), enacted by the legislature in 1990, applies to this case to relieve LIGA from liability for the payment of pre-insolvency court costs and legal interest. The statutory provision was codified pursuant to Act 105 of 1990, which became effective on September 7, 1990. It provides as follows:
"Covered claim" shall not include any claim based on or arising from a pre-insolvency obligation of an insolvent insurer, including but not limited to contractual attorneys' fees and expenses, statutory penalties and attorneys' fees, court costs, interest and bond premiums, or any other expenses incurred prior to the determination of insolvency. (Emphasis ours)
In Prejean v. Dixie Lloyds Insurance Co., 602 So.2d 764 (La.App. 3rd Cir.1992), a panel of this court applied this limitation retroactively as a procedural law to hold that LIGA could not be cast for pre-insolvency court costs. In Castille v. McDaniel, 620 So.2d 461 (La.App. 3rd Cir.1993), another panel of this court, citing Prejean, applied the statute retroactively to absolve LIGA from liability for pre-insolvency court costs and legal interest. In the present case, all costs incurred at the trial level were incurred prior to the insolvency of PSMIC. We note, however, that the trial judge did not itemize the costs nor did he assess said costs against any parties. He also did not award legal interest in favor of the plaintiffs.
We respectfully disagree with the reasoning and conclusions reached in the above cited Prejean and Castille decisions. The better view, as espoused by the First Circuit in Gautro v. Fidelity Fire and Casualty Insurance Co., 623 So.2d 106 (La.App. 1st Cir.1993), writ denied, 629 So.2d 413 (La. 1993), and the Fourth Circuit in Morris v. Stewart, 617 So.2d 978 (La.App. 4th Cir. 1993), is that the enactment of La.R.S. 22:1379(3)(d) effected a substantive change in the law which abolished a right of an insured. See St. Paul Fire & Marine Insurance Co. v. Smith, 609 So.2d 809 (La.1992). Therefore, the statute must be applied prospectively only.
LIGA finally argues that, pursuant to La.R.S. 22:1382(A)(1)(b), it is not responsible for any legal interest whatsoever if the judgment in this matter exceeds $150,000. The statute, enacted by Act 253 of 1990, reads as follows:
The applicable limit per claim and per accident or occurrence shall be exhaustive of the entire liability of the association under this Part, however arising, without *1177 regard to the nature of or basis for that liability, except court costs incurred subsequent to the date of insolvency.
Prior to the enactment of this provision, which also became effective on September 7, 1990, the $150,000 limit per claim was not exhaustive of LIGA's entire liability because it could be held liable for additional amounts such as court costs and legal interest. Because this amendment divested the right of an insured, it is also substantive and is to be applied prospectively only.
In summation, the statutory amendments relied upon by LIGA as defenses are substantive in nature and not applicable to the plaintiff's claim which arose in 1987.

DECREE
The judgment of the trial court in favor of plaintiffs is hereby amended and harmonized as follows:

 I. Allocation of Fault:
 School Board 80%
 Richard 20%
II. Damages:
 a) General Damages $110,000.00
 b) Past Medicals (subject to a credit of $62,304.14) -0-
 c) Future Medicals 15,000.00
 d) Past Lost Earnings (subject to a credit of $19,729.91) 10,270.09
 e) Future Lost Earnings 70,000.00
 f) Loss of Consortium:
 1) Debra Richard 15,000.00
 2) Kimberly Richard 5,000.00
 3) Johnathan Richard 750.00
 ___________
 Total Damages $226,020.09
 Less 20% 45,204.02
 ___________
 Net Award $180,816.07

Judgment is rendered in favor of plaintiffs and against LIGA in the sum of $149,900.
Judgment is rendered in favor of plaintiffs and against the St. Landry Parish School Board in the sum of $30,916.07.
Judgment is rendered in favor of plaintiffs and against LIGA and the St. Landry Parish School Board for legal interest on the sum of $180,816.07 from date of judicial demand until paid and costs in the sum of $11,809.70.
AFFIRMED AS AMENDED.
DOUCET, Judge, dissenting in part.
I disagree that LIGA should be cast with court costs and legal interest. I agree with this court's decisions in Prejean v. Dixie Lloyds Insurance Co., 602 So.2d 764 (La. App. 3rd Cir.1992) and Castille v. McDaniel, 620 So.2d 461 (La.App. 3rd Cir.1993). In all other respects, I concur in the decision.
NOTES
[1] Hartford terminated weekly benefits prior to trial.